FILED

2011 Apr-15  AM 09:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION


UNITED STATES OF AMERICA,       *
                                        5:10-cr-471-HGD
                                *
     vs.
                                *       February 23, 2011 9:00 a.m.

GEORGE W. WHITE,                *       February 24, 2011 9:00 a.m.

          Defendant.           *       Huntsville, Alabama


* * * * * * * * * * * * * * * * * * * * * * * * *

**TRANSCRIPT OF TESTIMONY OF WITNESSES AND CLOSING ARGUMENTS
BEFORE THE HONORABLE HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE**


      * * * * * * * * * * * * * * * * * * * * * * *


For the USA:           Derek Vincent Eichholz, Esq.
                       Stephen Smith, Esq.
                       Office of the Staff Judge Advocate
                       AMCOM-Legal
                       111 Goss Road
                       Redstone Arsenal, AL 35898


For the Defendant:     Cecilia A. Pope, Esq.
                       P.O. Box 53
                       Huntsville, AL 35804


Court Reporter:        Leah S. Turner, CSR, RMR, CRR
                       Federal Official Court Reporter
                       1729 5th Avenue North, Room 325
                       Birmingham, AL 35203

*2*

**OFFICER MICHAEL ADAMS:**
Direct Examination by Mr. Eichholz ................   3
Cross-Examination by Ms. Pope .....................  16
Redirect Examination by Mr. Eichholz ..............  28


**OFFICER JAMES DEAN:**
Direct Examination by Mr. Smith ...................  31
Cross-Examination by Ms. Pope .....................  53
Redirect Examination by Mr. Smith .................  64
Recross-Examination by Ms. Pope ...................  66
Further Direct Examination by Mr. Smith ........... 108
Further Cross-examination by Ms. Pope ............. 111
Further Redirect Examination by Mr. Smith ......... 113

**TERESA IVY:**
Direct Examination by Ms. Pope ....................  70
Cross-Examination by Mr. Smith ....................  77

**GEORGE W. WHITE:**
Direct Examination by Ms. Pope ....................  80
Cross-Examination by Mr. Eichholz .................  94
Redirect Examination by Ms. Pope .................. 106

**CLOSING ARGUMENTS** ................................ 114

*3*

This cause came to be heard and was heard on the 23rd and 24th day of February, 2011, before the Honorable Harwell G. Davis, III, United States Magistrate Judge, holding court for United States District Court, Northern District of Alabama, Northeastern Division, in Huntsville, Alabama.

Proceedings continued as follows:

P R O C E E D I N G S

(COURT CALLED TO ORDER.)

THE COURT:  All right.  Call your first witness.

MR. EICHHOLZ:  Government calls Officer Michael Adams.

**MICHAEL ADAMS,**

called as a witness by the Government, after having been sworn to speak the truth, testified as follows:

**DIRECT EXAMINATION**

**BY MR. EICHHOLZ:**

Q    Officer Adams, where are you employed?

A    Redstone Arsenal Police Department.

Q    What do you do there?

A    I'm a police officer.

Q    And how long have you been working there?

A    One year.

Q    In what capacity?  Have you been working as a police officer the entire time?

A    At Redstone Arsenal, yes, sir.  I spent five years with Chattanooga Police Department.

*4*

1      Q     What were you doing with the Chattanooga
2  Police Department?
3      A     Patrol officer.
4      Q     And are you doing patrol now?
5      A     Patrol officer.
6      Q     What training do you have to perform those
7  patrols?
8      A     When I went through the police academy in
9  Chattanooga, we were taught on DUI detection, field
10  sobriety test, basic traffic enforcement.  We actually
11  took a written test on field sobriety test, a hands-on,
12  and we also participated in what they call a drunk tank,
13  where they brought in civilians and let them drink and
14  we had to detect how much that they had had, whether or
15  not they were possibly over the legal limit.
16      Q     Do you still do additional training regarding
17  field sobriety tests as well?
18      A     Yes, sir.
19      Q     How often do you do that?
20      A     We do that once a year, in-service training.
21      Q     It's like a refresher training?
22      A     Yes, sir.
23      Q     Who monitors that training?
24      A     The supervisors.
25      Q     I want to take you specifically to the night

**5**

1    of September 18th at Redstone Arsenal.  You were working

2    that night?

3         A    Yes, sir, I was.

4         Q    Did you get a call to Gate 9 that night?

5         A    Yes, sir.  There was a call that came out for

6    a possible DUI, and I went down to back up Officer Dean.

7         Q    When you got down there, what did you observe?

8         A    When I first pulled up on the scene, I

9    observed Officer Dean talking to the suspect at the

10   time, and the officer he was training had left him and

11   walked up to her car, so I moved forward with Officer

12   Dean for officer safety.

13        Q    Did you talk to him, to Officer Dean?

14        A    Yes, I did.

15        Q    What did the two of you talk about?

16        A    Initially when I stepped up I asked Officer

17   Dean if he wanted me to do a field sobriety test, and he

18   said sure, so I turned my attention to the suspect.

19   Initially we exchanged greetings, and then I asked him

20   the standard questions prior to starting the test about

21   his medical conditions, if he had any, whether or not he

22   wore glasses or contacts, if there was anything wrong

23   with his neck, back, legs, knees, and he stated that he

24   had a problem with his vision.  He couldn't fly

25   helicopters because his eyes wouldn't move.

*6*

1       Q     Why do you ask these questions about medical
2  problems the individual might have?
3       A     The first thing is to assess the condition of
4  the suspect, try to ascertain whether he is under the
5  influence of something; and secondly, to find out if he
6  will be able to do the series of tests that they have to
7  do for the field sobriety test.
8       Q     Did you notice anything about him specifically
9  while you were talking to him?
10      A     Yes, sir.  His eyes were glassy and red and he
11 had an odor of alcohol from him.  Not his clothes; it
12 was coming from him.  And he was a little bit uneasy on
13 his feet.
14      Q     Do you see the person you saw that night in
15 the courtroom today?
16      A     Yes, sir, I do.
17      Q     Can you please identify him for the Court?
18      A     It's the white gentleman sitting at the table
19 beside the young lady.  He has a beard.
20            MR. EICHHOLZ:  Let the record reflect the
21 witness has identified the defendant in the case.
22            THE COURT:  All right.
23      Q     So how close did you actually get to the
24 accused that night?
25      A     I got close enough.  It was within a foot, 12,

**7**

1   15 inches away from him.

2       Q    You mentioned that his speech sounded slurred.

3   Can you describe that a little bit more specifically, I

4   guess?  What do you mean by that?

5       A    When he would answer the questions I was

6   asking him, his speech was slurred.  It was kind of slow

7   and blended together.  It's hard to explain what slurred

8   speech is.  I mean, it's slurred.

9       Q    Did he say what he had been doing that night?

10      A    He said he had been at home drinking.

11      Q    Did you ask him where he lived?

12      A    No, sir, I did not.

13      Q    Did he give you any indication if he knew

14  where he was or anything like that?

15      A    He said he was going to the Fest, which was on

16  the other side of the Arsenal.  He thought he was at

17  Gate 10.

18      Q    He thought he was at Gate 10 and he was at

19  Gate 9?

20      A    Yes, sir.

21      Q    What is the approximate distance from Gate 9

22  to Gate 10?

23      A    If you travel from Gate 9 to Gate 10 through

24  the Arsenal, it's probably about three or four miles.

25      Q    And you could take 565 to get there as well?

8

1       A     Yes, sir, you can.

2       Q     About what would you estimate the distance of

3   those two gates on 565?

4       A     Five to seven miles.

5       Q     All right.  Now, you said that the

6   individual -- his balance wasn't good.  What do you mean

7   by that?

8       A     He was swaying, kind of rocking back and

9   forth, sideways.

10      Q     And you also said that at some point you began

11  administering standard field sobriety tests?

12      A     Yes, sir, I did.

13      Q     And, again, can you tell the jury where you

14  learned about these tests or where you learned how to do

15  these tests?

16      A     The initial training I received was with the

17  Chattanooga Police Department, and in their training

18  they took you through each of the three tests that's

19  standard for that.

20            The HGN, horizontal gaze nystagmus, is the

21  first test that is conducted.  Once you ascertain that

22  there's probable cause that the person may be under the

23  influence, then you move to the walk-and-turn.  Once you

24  conduct that test, then you conduct the one-legged

25  stand.

9

1      Q      Now, that night you did the walk-and-turn

2  test?

3      A      Yes, sir, I did.

4      Q      Can you describe the walk-and-turn test?

5      A      The walk-and-turn test is a test -- it's a

6  divided attention test.  What you do is you place the

7  suspect in the instructional position where they place

8  their left foot down and place the right foot in front

9  of the left foot, heel to toe.  You ask them to put

10  their arms down by their side and you tell them not to

11  do anything until you tell them to do so, and you ask

12  them do they understand the instructions to that point;

13  and they tell you yes or no.  If they tell you no, you

14  repeat the instructions.  If they say yes, which is the

15  case that happened that night, then you demonstrate the

16  test to them by starting them in the instructional

17  position, walking heel to toe, looking at your feet.  As

18  far as officer safety goes, I don't do that.  I watch

19  the defendant -- sorry; the suspect.

20          You are walking heel to toe, looking at your

21  toes, counting out loud, with your arms down by your

22  side.  Once you reach the ninth step, you turn to the

23  left, taking small steps, and you walk back in the same

24  manner as you walked the first time, heel to toe,

25  counting out loud.

**10**

1      Q    You said a lot there, and I kind of want to
2  break down some of the things you said.  You said it's a
3  divided attention task test?
4      A    Yes, sir.
5      Q    Why is it important that you do divided
6  attention task tests?
7      A    When someone is asked to do multiple things,
8  what you are doing is you are asking them to process
9  information while they are physically doing something.
10  In this case you are asking them to stand in a certain
11  position and not do anything other than stand there
12  while they process the information or tell them about
13  how to do the test.
14      Q    So is driving a divided attention task test?
15      A    Yes, sir.
16      Q    How so?
17      A    When you are driving you are doing multiple
18  things, the radio, shifting gears, brakes, the gas,
19  signs, other cars around you.  You are actually having
20  to maintain control of the vehicle while you are
21  actually thinking, having a logical thought process to
22  operate that vehicle, and go from point A to point B.
23      Q    So the purpose of the test, then, is to mimic
24  these divided attention to see if you can do multiple
25  things at one time?

**11**

1      A     Yes, sir.

2      Q     And so that's why you use it to gauge

3  someone's ability to drive to determine if they are

4  impaired?

5      A     Yes, sir.

6      Q     Now, you said that you did the walk-and-turn

7  test?

8      A     Yes, sir.

9      Q     And you kind of outlined as far as taking nine

10  steps forward, turning, and then nine steps backward?

11      A     Yes, sir.

12      Q     Can you describe how the defendant performed

13  on that test?

14      A     When I placed him in the instructional

15  position, he stepped off the line and placed his feet

16  beside each other to maintain his balance and he stood

17  there until I was finished with the instructions.

18      Q     You physically instructed him on a way in

19  which to stand while you were instructing him?

20      A     Yes, sir.

21      Q     And then he moved his feet?

22      A     Yes, sir.

23      Q     And also, what did he do with his hands?

24      A     Once he stepped off the line, his hands went

25  back by his side.

**12**

1    Q    You said he stepped off the line.  What do you
2  mean by that?
3    A    When you are in the instructional position,
4  your left foot is the first foot you place in position.
5  You put your right foot in front of your left foot, heel
6  to toe, and your arms down by your side.  So you are
7  virtually standing in an awkward position.  And he moved
8  his right foot so that he could support himself.
9    Q    And so during this instructional phase, I
10  guess it's a divided attention task as well; is that
11  right?
12    A    Yes, sir.
13    Q    What must you be paying attention to at that
14  point?
15    A    Well, he has to pay attention to the way he is
16  standing because that's what he was told to do, and he
17  also has to pay attention to the person giving
18  instructions on how to do the test.
19    Q    And he also has to pay attention to his
20  balance as well?
21    A    That's part of him being in position, yes,
22  sir.
23    Q    So that would be the first phase.  And the
24  second phase is actually performing the test?
25    A    Yes, sir.

**13**

1     Q    Okay.  Now let's talk about how he performed
2  on that test.  How did he perform on that test?
3     A    When he started walking, he missed heel to toe
4  several times.  He didn't count out loud.  When he got
5  to the ninth step, he turned the wrong way and he did a
6  balancing movement to turn back facing the direction he
7  came from, and then he walked back to the beginning or
8  the finish line, if you will, in the same manner,
9  missing heel to toe and not counting out loud.
10     Q    Did you also administer an additional field
11  sobriety test that night as well?
12     A    I did, sir.
13     Q    Did you administer the one-legged stand?
14     A    Yes, sir, I did.
15     Q    And can you describe the first phase of the
16  one-legged stand test as well?
17     A    You place them in the instructional position,
18  which is basically him standing with his feet together,
19  his arms down by his side, not doing anything, while you
20  demonstrate the test, and explain what you want him to
21  do.
22     Q    What task are you paying attention to at this
23  point?
24     A    The suspect?
25     Q    Yes.

**14**

1    A    He is paying attention maintaining his balance

2  and standing the way he was told to stand while he is

3  also watching the person that is administering the test

4  to see how to do the test.

5    Q    So he is also processing what you are telling

6  him as well?

7    A    Yes, sir.

8    Q    Was he able to maintain his balance while he

9  was watching you?

10    A    He was uneasy on his feet.  He swayed.

11    Q    And then actually as far as the actual

12  performance portion of the test, how did he do with

13  that?

14    A    He raised his left foot.  He put his foot down

15  several times, approximately three times.  He missed

16  counting in a row.  You have to look at your foot, point

17  your foot out.  To describe the test --

18    Q    Please do.

19    A    You have them stand with their arms down by

20  their side and then you demonstrate the test.  You tell

21  them to raise either foot approximately six inches off

22  the ground and point it out and look down at their foot

23  and count out loud in a manner that you want them to

24  count, which is normally one-1000, two-1000, three-1000,

25  and continue counting until you tell them to stop.

**15**

1        This gentleman, like I say, he put his left

2    foot down approximately three times and he missed

3    certain numbers.  It was just an indication to me that

4    he was possibly impaired.

5        Q    When you say he was missing certain numbers,

6    you mean he was going from one-1000 to maybe three-1000,

7    things like that?

8        A    Exactly, sir.

9        Q    Officer Adams, lastly, I want to ask you

10   several conclusory questions.  Did the suspect pass your

11   test?

12       A    He performed poorly on the test.  I was

13   trained that there is no pass or failing.  You either

14   perform well or you perform poorly.  In the beginning

15   when I first spoke to the gentleman, I told him I wanted

16   to do a series of tests to make sure that he was okay to

17   drive the vehicle, and he agreed to do the test.  At the

18   end of the test he asked me how he did, and my reply to

19   him was I think you are under arrest for DUI, but I'm

20   not the responding officer.  At that time Officer Dean

21   stepped forward and arrested him.

22       Q    Based upon your physical observations with the

23   individual and also his performance of the test, do you

24   have an opinion as far as whether or not the defendant

25   was under the influence of alcohol that night?

**16**

1    A    Yes, sir.  He was impaired.  He was under the

2  influence.

3    Q    Based upon those same criteria, your training,

4  your experience, and your interaction with the defendant

5  that night, do you have an opinion as far as whether his

6  normal facilities were impaired that night?

7    A    Yes, sir.  He shouldn't have been operating a

8  vehicle.

9    Q    Based upon that training and experience and

10  your observations, do you have an opinion as far as

11  whether or not he was so impaired that he should not

12  have been behind that vehicle?

13    A    He should not have been behind that vehicle,

14  the wheel of the vehicle.

15         MR. EICHHOLZ:  Nothing further.

16         THE COURT:  Cross-examination?

17                    **CROSS-EXAMINATION**

18  **BY MS. POPE**:

19    Q    Officer Adams, I want to first thank you for

20  calling me a young lady.  I haven't been called that in

21  a long time, so thank you for that.

22         Did you at any time see Mr. White operate his

23  vehicle?

24    A    No, ma'am, I did not.

25    Q    Where was his vehicle at the time you arrived

17

1   on the scene?

2       A    There is an awning out at the guard shack.

3   The vehicle was under the awning.  They use that side of

4   the guard shack to perform inspections.

5       Q    So he was still at the gate, then?

6       A    Yes, ma'am.

7       Q    So as I understand you, he was at the gate --

8   I guess they move him around to another part of that

9   gate; is that correct?

10      A    Yes, ma'am.  You have an entrance gate.  When

11  you pull forward, the guards out there, if they need to

12  get ID or inspect the vehicle or something, they have

13  you pull around the guard shack facing north or leaving

14  the Arsenal.

15      Q    And you said once you got there that Officer

16  Dean was already on the scene; is that correct?

17      A    Yes, ma'am.

18      Q    What was Officer Dean doing upon your arrival?

19      A    He was talking to the suspect and also talking

20  with Officer Duggins, who is no longer with us.

21      Q    So once you got there, what did you do next?

22      A    I observed for a moment.  When Officer Duggins

23  left Officer Dean to go back to her patrol car, I

24  stepped forward for officer safety.  And once I stepped

25  forward and Officer Dean saw me, I did a field sobriety

**18**

1     test on him.

2          Q     Were you the only one that performed the field

3     sobriety test that evening?

4          A     Yes, ma'am.

5          Q     And are you certified in performing these

6     standardized field sobriety tests?

7          A     Yes, I am.

8          Q     And where did you obtain that certification?

9          A     Chattanooga Police Department.

10         Q     When did you obtain that certification?

11         A     2004.

12         Q     Have you had to go to any recertification

13    courses since 2004?

14         A     No, but I went through one when I started with

15    Redstone.  They sent me through their academy and they

16    had field sobriety test training out there.

17         Q     Did you receive a certification from that

18    training as well?

19         A     Just through the academy.

20         Q     But no specific certification in field

21    sobriety testing?

22         A     No, ma'am.

23         Q     In those tests, what is a determining

24    factor -- you said no one really passes or fails.  What

25    is the determining factor when you consider them to be

**19**

1    performing, as you said, poorly?

2         A    Each test is designed with a number of clues

3    in it.  The HGN has six clues.  The walk-and-turn has

4    eight.  The one-legged stand has four.  It doesn't

5    necessarily mean if he does not walk heel to toe nine

6    times -- if he missed it nine times, that does not

7    include nine clues.  Once he does one part of the test

8    improperly, that's a clue.

9         Q    Okay.  You said the walk-and-turn has eight

10   clues, I believe you said?

11        A    Yes, ma'am.

12        Q    Can you tell the jury what those eight clues

13   are, please?

14        A    I don't know that I can recite all eight of

15   them.  When he steps off the line, that's a clue.  When

16   he doesn't walk heel to toe, that's a clue.  When he

17   doesn't talk out loud or speak out loud while he is

18   counting, that's a clue.  When he turns an improper turn

19   or turns the wrong way, that's a clue.  When he uses his

20   hands to keep his balance, that's a clue.  There's

21   several things that you are looking for.

22        Q    But you don't remember all eight of them?

23        A    No, ma'am.

24        Q    And you said the one-legged stand, I believe,

25   has four clues?

**20**

1    A    Yes, ma'am.

2    Q    Can you tell the jury what those four are,

3  please.

4    A    When he uses his hands to maintain his

5  balance, he hops, he puts his foot down, he doesn't

6  count out loud.  He was not pointing his toe in the

7  right direction, which is pointing outward.  When he

8  raises his foot too high or too low.  Several things

9  that would indicate that he is not doing what he is

10  supposed to do.

11    Q    Let's start with the walk-and-turn test that

12  you performed.  How was it specifically administered?

13  Can you tell me again?  How do you administer that

14  particular test, the walk-and-turn?

15    A    Do you want me to conduct a test?  Is that

16  what you're saying?

17    Q    I would like to have the description again of

18  how you described to the defendant how it's

19  administered.

20    A    Okay.  If I was going to administer the test

21  to you or the suspect, what I would tell them to do is

22  place your left foot on this line, whether there was a

23  line there or not, an imaginary line.  Place your left

24  foot down, place your right foot in front of your left

25  foot, standing heel to toe, which simply means that the

**21**

1   heel of your right foot is touching the toe of your left

2   foot.  Place your hands down beside your side and do not

3   do anything until I tell you to do so.

4          And basically he was standing there in that

5   position until I demonstrate the test to you, and at

6   that point I will tell you you are going to take nine

7   steps walking forward, looking at your feet, counting

8   out loud until you get to nine.  When you get to your

9   ninth step, you are going to turn to the left in this

10  manner, and I would take short, choppy steps turning to

11  the left until I faced about in the direction I came

12  from on the imaginary line or the actual line.  And then

13  I would tell them you are going to walk back heel to

14  toe, counting out loud, until you reach your ninth

15  step.  And I would ask them do you understand.  And then

16  I would tell them to begin the test.

17         Some of the things you look for:  Do they

18  begin early?  Do they begin before you tell them to?

19  There is just a variety of things.  It is an attention

20  divided test, and what you are doing is you are having

21  them stand in that one position while you describe the

22  test to them and then you answer any questions.  They

23  still must maintain their balance and stay in that one

24  position while you are talking to them.

25         Q    Did you demonstrate to Mr. White how to

**22**

1  perform this test?

2       A    I did.

3       Q    The next test was the one-legged stand, I

4  believe; is that correct?

5       A    Yes, ma'am.

6       Q    Can you explain to me again how you described

7  to Mr. White to perform that test?

8       A    Yes, ma'am.  After we finished the walk-and-

9  turn I said, Okay, the next test is the one-legged

10 stand.  What I need you to do is stand with your feet

11 together and your hands down beside your side.  Don't do

12 anything until I tell you to do so.  Do you understand?

13 And his reply was yes.

14           Then what I did was I demonstrated for him.  I

15 said, Sir, with either foot, I don't care which, raise

16 it approximately six inches off the ground, point your

17 toe out, look at your foot, and count out loud as such:

18 one-1000, two-1000, three-1000, until I tell you to

19 stop.  Do you understand?  And he said yes.  And I said

20 begin the test.

21      Q    Okay.  Let me make sure I understand this.

22 You stand on one leg, you extend it six inches off the

23 ground?

24      A    No, ma'am.  You extend one of your legs.  You

25 can use either leg, either your left leg or your right

**23**

1   leg, and raise your foot six inches off the ground.

2        Q    And you said something about you point your

3   toe downward?

4        A    You point it out.

5        Q    Out?

6        A    Yes, ma'am.

7        Q    Are you talking about -- I have on four-inch

8   heels.  Are you talking about like that (indicating)?

9        A    Similar, yes, ma'am.

10            THE COURT:  Would you like him to come down

11   and demonstrate?

12            MS. POPE:  Yes.

13        Q    Could you please come down and demonstrate?

14        A    Yes, ma'am.  When you have the suspect and you

15   are ready to do the one-legged stand, you stand with

16   your feet together and your arms down by your side.  And

17   you tell them don't do anything until I tell you to do

18   so.  You tell them to raise the foot off the ground

19   approximately six inches and count out loud, and you

20   demonstrate this is what you're asking them to do.

21   Raise your foot out as such and you count out one-1000,

22   two-1000, three-1000, four-1000, five-1000, six-1000,

23   seven-1000, eight-1000, nine-1000, ten-1000, eleven-

24   1000, twelve-1000, thirteen-1000, fourteen-1000,

25   fifteen-1000, sixteen-1000, seventeen-1000, eighteen-

**24**

1    1000, nineteen-1000, twenty-1000, twenty-one-1000,

2    twenty-two-1000, twenty-three-1000, twenty-four-1000,

3    twenty-five-1000, twenty-six-1000, twenty-seven-1000,

4    twenty-eight-1000, twenty-nine-1000, thirty-1000.  When

5    they have done that, you tell them to relax.

6         Q    All right.  So they are to count to 30

7    seconds, basically, then.

8         A    The test is a 30-second test.  It's timed.

9    You don't tell them to count to 30.  You tell them to

10   count until you tell them to stop.

11        Q    How far did you get with Mr. White that

12   evening?

13        A    He got to 20-something-thousand and he missed

14   between 13 and 17.  Somewhere through there he missed

15   those numbers.

16        Q    So he did up to 13 before he missed or put his

17   foot down.  Is that what you are saying?

18        A    No, ma'am.  He counted consecutively up to 13

19   before he started missing numbers.  He had to place his

20   foot on the ground three times during the test.

21        Q    Do you remember what type of shoes Mr. White

22   had on that evening?

23        A    No, ma'am, I don't.

24        Q    Do you ever take into account the type of

25   footwear a person has on?

**25**

1        A     Yes, ma'am.  They have the option of removing

2    the footware if they decide to.  It's not something

3    that's brought up.  If you were to do the test in high

4    heels and you didn't want to do it, you would be

5    permitted to take your shoes off.

6        Q     Do you remember if Mr. White left his shoes on

7    that evening or removed his shoes?

8        A     I do not.

9        Q     Officer, do you think it's normal for people

10   to make mistakes both physically and mentally when they

11   are nervous?

12       A     Some people.

13       Q     Do you believe that some people get nervous

14   when they are stopped by police officers?

15       A     That's a natural reaction, yes, ma'am.

16       Q     Do people make mistakes sometimes even without

17   consuming alcohol?

18       A     I have never tested anyone that was sober on a

19   field sobriety test.

20       Q     Never in the six years you have been in active

21   duty have you ever had anybody that passed the field

22   sobriety test?

23       A     Can you say that again?

24       Q     You have been a police officer approximately

25   six years, one year at Redstone Arsenal and five years

**26**

1    in Chattanooga; correct?

2        A    Yes, ma'am.

3        Q    So in those six years you have never had

4    anybody perform well on the field sobriety test?

5        A    I've had people perform well, but the ones

6    that didn't perform so well, the ones that performed

7    poorly, they were always found to be over the legal

8    limit.

9        Q    You just stated that nobody -- you have never

10   seen anybody without consuming alcohol perform on this

11   test.  Let me restate that.

12            I asked you if there are people who make

13   mistakes even without consuming alcohol, and you said

14   you had never had anybody perform who was not under the

15   influence.  So is that a correct statement?

16       A    No, ma'am, it's not.  What I said was I have

17   never conducted that test on a sober person.  The people

18   that I have come in contact with have at some point been

19   influenced either by alcohol or drugs.  It's hard to

20   answer that question without talking about the HGN.  So

21   if you will permit me to talk about that, I can answer

22   that.

23            THE COURT:  Just answer the questions as you

24   are asked.

25            THE WITNESS:  Yes, sir.

1      A      When I come in contact with someone that may

2  or may not --

3           MS. POPE:  Your Honor, I don't believe there

4  is a question.  I believe he has answered my question.

5           THE WITNESS:  Okay.

6      Q      So during that evening, Officer Dean never

7  performed his own field sobriety tests?

8      A      No, ma'am.

9      Q      Did you ever have a discussion with Officer

10  Dean about whether or not Mr. White had performed -- I

11  don't want to say passed -- had performed well or

12  satisfactorily on the test?

13      A      No, ma'am.  Immediately after the test was

14  over, the suspect asked me how he did and I told him I

15  thought he would be under arrest for DUI, and that's

16  when Officer Dean stepped forward and arrested him.

17      Q      Was Mr. White ever belligerent with you that

18  evening?

19      A      No, ma'am.  He was compliant.

20      Q      Just a couple followup questions.  You said

21  when he did his turn on the walk-and-turn that he

22  bounced.  Can you describe in better detail what you

23  mean by bounced?

24      A      When he turned, instead of taking small,

25  short, choppy steps to turn, he did a bouncing movement

1   and actually left the ground with both feet.

2        Q    Did he fall?

3        A    No, ma'am.

4        Q    Did he fall at any time during either of those

5   tests, the walk-and-turn or the one-legged stand?

6        A    No, ma'am.

7             MS. POPE:  No further questions at this time,

8   Your Honor.

9             THE COURT:  Any redirect?

10            MR. EICHHOLZ:  Yes, sir.

11                    **REDIRECT EXAMINATION**

12   **BY MR. EICHHOLZ:**

13       Q    Officer Adams, did Officer Dean watch you

14   perform the field sobriety test?

15       A    Yes, sir, he did.

16       Q    I also want to address another issue.  You

17   said that you never administered the one-legged stand to

18   anyone that you didn't believe was already under the

19   influence of alcohol.  Is that -- or please restate what

20   you said earlier.

21       A    I have never administered a field sobriety

22   test, which means all three tests, to a sober person.

23       Q    Before you administered any test, what are you

24   doing with that individual?

25       A    I'm talking with them.

**29**

1       Q     And why are you talking to them?

2       A     I'm trying to ascertain or obtain information

3    that will let me know whether or not they are under the

4    influence or they are impaired.

5       Q     And what kind of information would you

6    actually be trying to get from them?

7       A     Who they are, where they are coming from.  I

8    would ask them questions to get them talking.  What I'm

9    looking for is how they are talking, how they are

10   reacting to the questions I'm asking, kind of what is

11   their thought process, are they making sense, that type

12   thing.

13      Q     Would you be smelling their breath?

14      A     Yes, sir.

15      Q     Would you be listening for slurred words?

16      A     Yes, sir.

17      Q     Would you be listening to see if they are

18   making sense?  Like you said, making sense as far as

19   directly answering the questions they are being asked?

20      A     Yes, sir.

21      Q     And so it's only after you have done all of

22   that that you then administer any field sobriety tests?

23      A     That's correct, sir.

24      Q     So if someone passes your first field sobriety

25   test, do you give them a second field sobriety test?

**30**

1      A      There is no set number that you have to do or

2  not do.  If you make a mistake on the test, you can redo

3  it.  However, whenever I deal with people, if I don't

4  pick up any clues on that first test, then I don't go

5  any further.

6      Q      So when you say you have never given all three

7  standard field sobriety tests to a sober person, what

8  you're saying is, one, they failed the initial, the

9  initial interview stage, if you will; right?

10     A      Yes, sir.

11     Q      They failed that first test; correct?

12     A      Yes, sir.

13     Q      They failed the second test; correct?

14     A      You're talking about detection in the first

15  phase.  I walk up to a car; I'm talking to someone; I

16  smell the alcohol; I see something that tells me that

17  this person may be impaired, so that gives me probable

18  cause to start a field sobriety test.  The next step

19  would be the HGN.  If I don't get enough clues on that,

20  then I'm not going any further.  Just because someone

21  has alcohol on their breath does not mean that they are

22  impaired.  However, if you get the clues on the HGN that

23  would support you doing the rest of the sobriety test,

24  that's what you do.

25     Q      But to readdress what you talked to Ms. Pope

1  about, when you say that you have never done all three

2  tests or you have never done all your tests on a sober

3  person, what you are saying is on a sober person you

4  would have stopped before you would have completed all

5  the tests?

6      A    On a person that I did not have enough clues

7  on to go to the next test, that's what I mean.

8      Q    You would have stopped?

9      A    I would have stopped.

10         MR. EICHHOLZ:  Thank you.

11         THE COURT:  Anything else?

12         MS. POPE:  Not at this time, Your Honor.

13         THE COURT:  All right.  You may step down.

14  Thank you.  Next witness?

15         MR. EICHHOLZ:  The Government next calls

16  Officer James Dean.

17                    **JAMES DEAN,**

18  called as a witness by the Government, after having been

19  sworn to speak the truth, testified as follows:

20                 **DIRECT EXAMINATION**

21  **BY MR. SMITH:**

22      Q    Where are you currently employed?

23      A    Redstone Arsenal Police Department.

24      Q    How long have you been working there?

25      A    I've been a police officer out there for about

**32**

1    3 1/2 years now.

2        Q    As a police officer, what are your duties or

3    what is your position?

4        A    Basically patrol regulations for the safety of

5    the citizens and enforce local laws and regulations.

6        Q    I'm sorry.  How many years at Redstone?

7        A    About 3 1/2 years as a police officer.

8        Q    Prior to that do you have any other law

9    enforcement experience?

10        A    Yes, sir.  I was also a military policeman for

11    three years.

12        Q    And any other law enforcement experience

13    beyond that?

14        A    No, sir.

15        Q    Prior to becoming a military police officer at

16    the military, what training did you receive?

17        A    Basically went through the U.S. Army military

18    police school, went through law enforcement, a lot of

19    different training on that, and I have also gone through

20    the Department of Army Civilian Police Academy.

21        Q    And that was in connection with this position?

22        A    Yes, sir.

23        Q    And when did you receive that training?

24        A    That was in October of 2007.

25        Q    As a part of that training, what all were you

**33**

1    trained on out there at?

2         A    Basically went through a full curriculum of

3    constitutional law, civil rights, recognizing DUIs,

4    traffic enforcement, and also the arms qualifications

5    and also emergency vehicle training.

6         Q    I would like to focus for a minute on your

7    training regarding recognizing DUI and impaired drivers.

8    What type of training specifically did you receive

9    regarding that?

10        A    Basically went through the NHTSA standard

11   field sobriety testing.

12        Q    Can you expand that acronym?

13        A    NHTSA is the National Highway Traffic Safety

14   Administration.  It's basically a standardized system of

15   field sobriety testing for impaired drivers.

16        Q    And what are you taught regarding those field

17   sobriety tests and clues to look for?

18        A    Basically we are given three different tests

19   to perform.  One is the HGN, one is the walk-and-turn,

20   and one is the one-legged stand.

21        Q    Does each test have a method to follow?

22        A    Yes, sir.

23        Q    And assuming that that method is followed, is

24   that a reliable indicator of impairment by alcohol?

25        A    Yes, sir.

**34**

1     Q     Besides those field sobriety tests, what other
2   things are you instructed or taught to look for when you
3   come in contact with a suspected drunk driver?

4     A     Basically, you are instructed to observe and
5   detect any odors of alcoholic beverage; behavior of the
6   individual; divided attention test; see if they are
7   fumbling with different things or speech; the way the
8   individual looks; bloodshot, watery eyes; slurred
9   speech; stuttering; fumbling with things; not being able
10  to pull his driver's license out of his wallet; things
11  along those lines.

12    Q     During your training, did you perform these
13  tests in a classroom environment as a practical
14  exercise?

15    A     Yes, sir, I did.

16    Q     Was it required that you pass the practical
17  exercise before completing your training?

18    A     Yes, sir.

19    Q     And did you complete that training and pass
20  the criteria?

21    A     Yes, sir.

22    Q     As a part of that practical exercise, what all
23  did you do?

24    A     Basically, we had to perform the field
25  sobriety tests.  They got volunteers from the fire

**35**

1    department, carried them to a back room.  Some of them

2    were drinking; some weren't.  And performed the field

3    sobriety test on the individuals.  Then we would have to

4    try to guesstimate about what their alcohol level was.

5         Q    And how did you progress in your training?

6         A    Basically, pretty good.  Normally we worked as

7    a team of three people on each individual because we

8    had, like, 11 people in our academy and we wound up

9    working together, looking at the clues, trying to put

10   them together.  Most of us were pretty close to what the

11   person blew on the PBTs.

12        Q    As a police officer have you had the

13   experience of using the field sobriety test in the

14   field?

15        A    Yes, sir, I have.

16        Q    Can you estimate about how many times you have

17   done it?

18        A    Probably performed the test 25 to 30 times.

19        Q    I would like to talk specifically about two of

20   the tests that you already mentioned.  The first is the

21   walk-and-turn and the next is the one-legged stand.

22             Can you explain the walk-and-turn test and the

23   clues that you look for and how you explain it to a

24   suspected drunk driver?

25        A    Well, I basically put the individual standing

1    pretty much at attention, one foot in front of the

2    other, and have his arms down to his side, explain to

3    him what you want him to do, take nine heel to toe

4    steps, counting out loud, do a little bit of a pivot or

5    turn, keeping one foot on the ground, go back heel to

6    toe nine more turns and then stop.

7         What you are looking for on the clues there:

8    If he keeps his arms down to his side; if he is moving;

9    whether he actually makes heel to toe contact or if he

10   is stepping away not taking heel to toe; and whether he

11   actually stays on a line or not, if he stepped outside

12   and was kind of swaying.

13        MR. SMITH:  With leave of the Court, if I

14   could have the witness step outside the box and

15   demonstrate.

16        THE COURT:  You may.

17   Q    If you could stand by the corner of this desk.

18   A    Basically I bring them in a position like so,

19   hands down at their side, tell them not to start the

20   test until I have given full instructions, and I ask

21   them do they understand what I'm saying.  Then I say

22   when I tell you to begin the test, I want you to count

23   one, two, three, and continue on until you count to

24   nine.  When you get to that step, turn like so, come

25   back and perform the test back, counting to nine again.

*37*

1      Q     And what clues do you look for?

2      A     If they are not making heel to toe contact.

3  If they are swaying, arms coming out from their side to

4  maintain balance, or stepping off the line and

5  stumbling.  You are also looking for the safety of the

6  individual.  You don't want them to fall and hurt

7  themselves.  You want to keep a close eye on them.

8      Q     Regarding the one-legged stand test, explain

9  the instruction on that and also the clues that you look

10  for.

11      A     Basically, you are having them stand at the

12  position of attention to begin with and have them choose

13  whichever leg they prefer, whichever is stronger, lift

14  one of them up four to six inches off the ground, toe

15  pointed out, looking at their toe, keeping their hands

16  to their side, and start counting one-1000, two-1000,

17  three-1000, until you tell them to stop.  What you are

18  doing is watching them for 30 seconds, seeing that they

19  can maintain their balance and catch every number as

20  they are counting along.

21      Q     Have you also been trained on the use of the

22  Drager machine?

23      A     Yes, sir.

24      Q     And can you explain what the Drager machine

25  does and what it tests an individual for?

**38**

1    A    Basically, it's testing the breath alcohol

2 content, which also goes to blood alcohol content.  It's

3 set up by the State of Alabama.  You take two samples.

4 The breath samples go in for a period of about 10

5 seconds.  It gives you a little system that you can

6 watch them, keep them blowing through the tube.  It goes

7 through and analyzes the sample.  Then you do a second

8 sample and it takes the lowest sample out of the two and

9 that's what they print out.

10    Q    And just for clarification, how is the sample

11 taken from the person?

12    A    Through the breath, from their blowing through

13 a tube.

14    Q    So they are holding a device?

15    A    Basically, we hold the device and they put

16 their lips around the mouthpiece and they blow into it

17 until we tell them to stop, and then wait for the sample

18 to go through.

19    Q    Is the Drager machine a portable test or is

20 it something at the station?

21    A    It's stationed at the station.

22    Q    To use the Drager machine, does that require

23 training?

24    A    Yes, sir.

25    Q    Does it require certification?

**39**

1       A     Yes, sir.

2       Q     And have you received that certification?

3       A     Yes, sir, I have.

4       Q     From what agency have you received that

5   certification?

6       A     Alabama Department of Forensic Science.

7       Q     And is your certification current?

8       A     Yes, sir.

9       Q     Does the Drager machine allow you to operate

10  it if your certification is not current?

11      A     No, it does not.

12      Q     How does that work?

13      A     Each individual operator has their own ID that

14  they put into it, and if your ID is not current it will

15  not let you use the machine.

16      Q     Without a valid certification, the machine

17  will not operate?

18      A     Correct.

19      Q     Were you on duty on the night of 18 September

20  2010?

21      A     Yes, sir.

22      Q     And what shift were you on and what were your

23  duties that evening?

24      A     I was on second shift, patrol two, which is

25  north housing, right in that area.

**40**

1    Q    And second shift covers what hours?

2    A    We go into work at 130 to 2215.

3    Q    In the course of your duties, did you have

4    contact with a Mr. George White?

5    A    Yes, sir, I did.

6    Q    Do you recognize Mr. White in the courtroom?

7    A    Yes, sir.

8    Q    And can you identify him?

9    A    The gentleman sitting at the table right

10   there.

11        MR. SMITH:  Let the record reflect that the

12   witness has identified Mr. George White as the

13   defendant.

14        THE COURT:  It will.

15   Q    What caused you to come in contact with

16   Mr. White that evening?

17   A    Basically I was dispatched to Gate 9 for a

18   possible DUI.

19   Q    And when you approached Gate 9, what did you

20   observe?

21   A    When I approached Gate 9, I saw Mr. White at a

22   GMC Sonoma pickup truck, extended cab.  He was the

23   operator of the vehicle.  He also had a female passenger

24   in the passenger's seat and two female juveniles in the

25   extended cab.

**41**

1    Q    A simple question:  How did you know he was

2    the operator of the vehicle?

3    A    He was sitting in the driver's seat.

4    Q    Did you have another officer with you that

5    night?

6    A    Yes, sir.  A probationary officer, Ms. Wanda

7    Duggins, who was training with me that night.

8    Q    So you were training Ms. Duggins?

9    A    Yes, sir.

10   Q    Once you arrived on the scene, did you

11   interact with Mr. White?

12   A    Actually, when we first arrived on the scene,

13   I instructed Ms. Duggins to approach on the driver's

14   side as I was observing her and if she detected any odor

15   of alcoholic beverage or anything that would lead her to

16   believe that the individual was indeed intoxicated, to

17   go ahead and have him exit the vehicle and step to the

18   rear of the vehicle.

19   Q    How far away were you from Ms. Duggins?

20   A    I was on the other side of the vehicle,

21   approaching on the passenger's side, to keep an eye out

22   for officer safety and watched her.  She looked at me

23   and motioned for Mr. White or instructed him to exit the

24   vehicle, step to the rear.  I stepped back to the rear

25   driver's side bumper and watched him exit the vehicle

**42**

1  and start walking towards the back.

2      Q     Is it correct to say that you were on the

3  passenger's side of the rear of the vehicle when you got

4  the signal from Officer Duggins and then you shifted

5  over to the driver's side of the vehicle?

6      A     That's correct.

7      Q     And then you said that you saw Mr. White exit

8  the vehicle and walk towards you?

9      A     Yes, sir.  Basically he was staggering a

10  little more than walking and he stopped about to the

11  rear wheel well before going to the rear of the truck.

12  He had to be instructed again to step to the rear of the

13  vehicle.

14      Q     Was he using anything for balance?

15      A     He actually placed his hand on the bed of the

16  truck twice while he was walking back to the back of the

17  vehicle.

18      Q     And you said it was more of a stagger?

19      A     Yes, sir.  It wasn't really a walk.  He was

20  kind of uneasy on his feet, I guess.

21      Q     Once Mr. White did get to the back of the

22  vehicle, what happened at that point?

23      A     Basically, at that point I took charge of the

24  individual.  I asked him if he had any weapons or

25  anything on him that I need to know about.  He stated he

**43**

1    did not.  I informed him I was going to perform a Terry

2    frisk for officer safety, everybody's safety.  I patted

3    him down.  As I started patting him down, I detected a

4    strong odor of alcoholic beverage coming from his

5    person.  I patted him down; found no weapons.

6         Q    If could stop you.  Can you explain what a

7    Terry frisk is, please.

8         A    Basically it's a search for weapons for the

9    officers' involvement, safety for the officers and

10   anybody else there.  Basically, it's just a quick

11   pat-down.  Basically, we're looking for weapons, knives,

12   anything that might endanger myself, my partner, or

13   anybody else there at the scene.

14        Q    Where do you start patting the person down?

15        A    I started with the top shoulders and patted

16   him down.  Basically, you want to bring the hands to the

17   back, rest the hands together, hold onto them with one

18   and just pat-down in quarters down one side and switch

19   over and go down the other side.

20        Q    Is it safe to say that you are in close

21   proximity to the person?

22        A    Yes, sir.

23        Q    And when you did that, you said that you did

24   detect a strong odor of alcohol?

25        A    Yes, sir.

**44**

1      Q    Putting it on a scale of 1 to 10, how strong
2  was the odor of alcohol?
3      A    It was pretty stout.  I would say probably
4  about an 8.
5      Q    Once you detected the odor of alcohol, what
6  did you do at that point?
7      A    I explained to him that, number one, he was
8  suspected of driving under the influence of alcohol,
9  that I wanted him to perform some field sobriety tests,
10 and I asked him if he had had anything to drink, and he
11 stated that he had had a couple of drinks before he left
12 the house.
13     Q    Did he mention what type of drinks?
14     A    No, sir, he didn't.
15     Q    Was it generally understood that it was
16 alcohol he was referring to?
17     A    Yes, sir.
18     Q    While he was speaking to you, can you describe
19 his speech?
20     A    Basically, his speech was a little slurred.
21 When he first approached, his eyes were bloodshot,
22 watery.  He was slurring his speech a little bit.  He
23 asked me if I knew Pat Stewart, which was the captain
24 that recently retired from Redstone Arsenal Police
25 Department.  He said he went to high school with him.  I

**45**

1    said yes, he just retired.  He was speaking, was

2    friendly, but he was still slurring his speech a little

3    bit, and I detected the odor of alcohol.

4         Q    So he was giving more than just one-word

5    answers?

6         A    Yes.

7         Q    And you were able to make a good assessment on

8    his quality of speech?

9         A    Yes, sir.

10        Q    You described his eyes.  Can you say that one

11   more time?

12        A    They were bloodshot and watery.  Basically

13   it's one of the things that we are looking for as far as

14   somebody intoxicated or doing some type of drugs or

15   anything when we are dealing with the general public,

16   especially in a situation like that.

17        Q    You detected the odor, and his eyes, his

18   speech.  Based on that, what did you decide to do next?

19        A    That's when we decided to administer the field

20   sobriety test to check the level of his intoxication.

21        Q    Did you explain to him the field sobriety test

22   that you were about to administer?

23        A    Yes, sir.

24        Q    As it relates to the walk-and-turn test, did

25   you explain it in a way that you just explained it to

**46**

1    me?

2         A    Yes, sir.

3         Q    Did Mr. White have any questions or did he

4    misunderstand while you were explaining?

5         A    No.  He said that he understood everything as

6    he was performing the tests.

7         Q    At any point while you were administering the

8    tests, did you have to reexplain things to Mr. White?

9         A    No, sir, I don't recall having to reexplain

10   anything to him.

11        Q    In the area where you were administering the

12   walk-and-turn test, do you remember any obstructions on

13   the ground?  Or can you describe the terrain in general?

14        A    Basically, he was on a blacktop where the

15   turn-around lane was, and I had Officer Duggins move our

16   vehicle back a little bit because I didn't want to

17   perform the test in front of the two little girls in the

18   vehicle.

19             So I got him to the rear of the vehicle, kind

20   of outside of them where they would have to really

21   strain their necks to see what was going on, and that's

22   where we performed it, on a level surface.

23        Q    Can you describe Mr. White's performance on

24   the walk-and-turn test?

25        A    The walk-and-turn, I said he wasn't walking

**47**

1   heel to toe.  I think he hit maybe four times out of

2   nine, and then he did kind of a bouncing around instead

3   of the pivot turn, like I was showing you how to do.

4   And the walk back, he was off the line a couple of times

5   and he wasn't making the heel to toe contact.

6        Q    What did those clues indicate to you?

7        A    Basically, it showed that he was intoxicated.

8   As far as the level, probably within about a one-one or

9   more.

10       Q    After you administered the walk and turn, what

11  happened at that point?

12       A    At that point in time Officer Adams approached

13  and offered to take over, and he went ahead and took

14  over and did the whole standardized field sobriety test.

15       Q    Starting from the beginning?

16       A    Yes, sir.

17       Q    Once Officer Adams took over, did you observe

18  Officer Adams administer this test?

19       A    Yes, sir.

20       Q    How far would you say you were from Officer

21  Adams?

22       A    I was probably within four to five feet from

23  Officer Adams as he was explaining the test and on a

24  90-degree angle from Mr. White so I could keep an eye on

25  him and on Officer Adams for officer safety.

**48**

1     Q     Could you hear what Officer Adams was saying?

2     A     Yes.

3     Q     Could you hear anything that the defendant was

4   saying?

5     A     Yes, sir.

6     Q     And were you able to observe Mr. White's

7   performance on the field sobriety test that Officer

8   Adams administered?

9     A     Yes, sir.

10     Q     What did you observe on his performance?

11     A     On the walk-and-turn, he did the same thing.

12   He wasn't counting the steps off like he was supposed to

13   during that, and he wasn't hitting heel to toe.  He

14   stepped off line two or three times and had to bring him

15   back.  Instead of doing the pivot turn, he kind of

16   hopped around and turned around and walked back.

17     Q     Just to back up, when you first approached the

18   car, besides the defendant, who else was in the vehicle?

19     A     There was the defendant's girlfriend, Teresa

20   Ivy, I believe her name was, and two small juvenile

21   children in the back of the extended cab truck.

22     Q     Jumping forward, when Officer Adams was

23   explaining the test, did he explain those tests based on

24   the training that you had received and did he do those

25   correctly?

**49**

1    A    Yes, sir, he did.

2    Q    After Officer Adams concluded his testing,

3  what occurred at that point?

4    A    After he concluded both tests, Mr. White was

5  placed under apprehension, preparing to transport him to

6  the station.  We asked him if he wanted his girlfriend

7  to drive the vehicle home, and he stated that she

8  couldn't drive a stick shift, so I asked him for his

9  permission to secure the vehicle at the scene and called

10  a cab for Ms. Ivy and the two children.

11    Q    Why couldn't Ms. Ivy, based on your

12  understanding, drive the vehicle?

13    A    He stated she could not drive a stick shift.

14    Q    And I'm assuming that the truck was a stick

15  shift?

16    A    Yes, sir.

17    Q    Did you see the juvenile children when they

18  were exiting the vehicle?

19    A    Yes, sir.

20    Q    Could you guess about what ages they were?

21    A    I would say probably 6 to 7, 8.  They were

22  fairly young children.

23    Q    Under the age of 10, would you say?

24    A    Yes.

25    Q    Again, based on your observations and your

**50**

1  experience, what prompted the decision to take Mr. White

2  to the police station?

3      A    The failure of the field sobriety test and in

4  conjunction with also the other observations that we

5  made as far as the way he was walking, speech, and the

6  odor of the alcoholic beverage.

7      Q    When you got to the station, who operated the

8  Drager?

9      A    I did.

10      Q    When you are about to administer a Drager

11  machine test to an individual, what procedures do you go

12  through?

13      A    The first thing you do is you have to give

14  them a 20-minute deprivation period.  That's 20 minutes

15  that you have control of the individual where he cannot

16  put anything in his mouth, he is not burping or throwing

17  up or anything.  If he does burp, then you have to start

18  the deprivation period all over again.  As soon as you

19  get that taken care of or while you are doing that, you

20  get the Alabama implied consent and make sure that he

21  understands that.  He read that and he said he

22  understood it but said he was not going to take the

23  test.  I said I understood that but we still have to do

24  this; I have to document your refusal.  As the machine

25  warmed up, gotten everything take care of, I asked him

**51**

1   again if he would submit to the test and he said no.  So

2   I put in his refusal, waited for the paperwork, and

3   locked him up in the D-cell.

4        Q    Did you read to him the Alabama law of implied

5   consent?

6        A    Yes, sir.

7        Q    Can you explain one more time what implied

8   consent is, based on your understanding?

9        A    What it is, anybody that has an Alabama

10  driver's license gives the consent to a blood alcohol

11  test, either by breath or blood, and if they deny that,

12  then their driving privileges are suspended for a period

13  of at least 90 days.

14       Q    So, in essence, by the virtue of the fact of

15  having an Alabama state driver's license, you have

16  already consented to doing these tests if you're asked

17  to by a police officer.  Is that a correct summary?

18       A    Yes.

19       Q    And did Mr. White understand that when you

20  explained that to him?

21       A    Yes, sir.  He stated that he did.

22       Q    And he didn't indicate anything otherwise?

23       A    No, sir.

24       Q    And so ultimately you ended it as a refusal to

25  the Drager test; is that correct?

**52**

1    A    That's correct.

2    Q    And after the refusal on the Drager test, what

3  occurred after that?

4    A    From that point in time I basically explained

5  to him that he would be locked up in the D-cell for 12

6  hours, and I believe that was right about 2030 hours.

7  I'm not sure what time he was released the next

8  morning.  But we went ahead and had his shoes taken off,

9  belt, stuff like that, made sure he didn't have stuff in

10  his pockets, and put him in the D-cell and secured him

11  for the night.

12    Q    What is the ticket out of the detention cell?

13  How does one get out of --

14    A    You basically have to have your blood alcohol

15  content down to an acceptable level, which is usually

16  down below .04, .03.  And depending on how some of them

17  do, some of them call a cab.  If they want to drive

18  their vehicle, you try and get them below zero.

19  Normally on a refusal where we didn't have anything to

20  go on, 12 hours is the minimum on that.

21    Q    Not that it happened in this case, but where a

22  person -- at the end of 12 hours, they will be about the

23  legal limit, would you let them --

24    A    They would be staying a few more hours until

25  their blood alcohol content came down.

**53**

1   Q    In summary, relying on all your observations

2   that night and your interaction with Mr. White and based

3   on your training, experience, and knowledge that you

4   received through your own experience, did you form an

5   opinion on Mr. White's ability to operate a vehicle?

6   A    Yes, I did.

7   Q    And what was that opinion?

8   A    Basically, that he was intoxicated and should

9   not be operating a vehicle.

10   Q    And based on that opinion, the decisions you

11   made, were they in line with the training and experience

12   that you received?

13   A    Yes, sir.

14   MR. SMITH:  May I have a minute, Your Honor?

15   THE COURT:  Yes.

16   MR. SMITH:  That's all the questions I have.

17   Thank you, Your Honor.

18                    **CROSS-EXAMINATION**

19   **BY MS. POPE:**

20   Q    Good afternoon, Officer Dean.  I'm sorry if I

21   have to repeat some of these questions, but I just need

22   to make sure that I got some of the answers correct, so

23   I'm sorry if I sound redundant.

24        At any time did you see the defendant,

25   Mr. White, operate the vehicle?

**54**

1      A      Mr. White was basically stopped at Gate 9 in

2  control of the vehicle, sitting in the driver's seat,

3  where the guards had stopped him.

4      Q      So when you say "basically stopped," you mean

5  he had already pulled around to the side?

6      A      Yes, ma'am.  He was already stopped on the

7  side there.  He was still in control of the vehicle and

8  the keys.  I believe the guards had taken the keys away

9  from him.

10      Q      You said there were some passengers with him

11  as well?

12      A      Yes, ma'am.

13      Q      Where were they at the time you arrived on the

14  scene?

15      A      They were inside the vehicle.  The adult

16  female was sitting in the passenger's side and the two

17  small children were in the back of the extended cab.

18      Q      Who was on the scene at the time you arrived?

19      A      Basically, we had -- it was two or three

20  security contract officers over there.  Officer Caudle,

21  I believe was her name, was the one that was actually in

22  charge and stopped the vehicle and had him stopped

23  there.

24      Q      Then at some point you perform some field

25  sobriety testing; is that correct?

**55**

1        A     Yes, ma'am.

2        Q     You did, I believe you said, the walk-and-

3    turn?

4        A     Yes, ma'am.

5        Q     Did you also perform the one-legged stand?

6        A     No, ma'am.  Officer Adams came up and took

7    over and we started the field sobriety test.

8        Q     But you did some testing on your own prior to

9    Officer Dean arriving on the scene?

10       A     Officer Adams.

11       Q     -- Officer Adams.  I'm sorry.

12       A     Yes, ma'am.

13       Q     Was he there at any time when you were

14   performing the walk-and-turn?

15       A     I think he was back from behind the vehicles,

16   and when he saw that the trainee that I had was not

17   moving forward, he came forward for officer safety.

18       Q     What was not moving forward?

19       A     The trainee that I was training, Officer

20   Duggins, that was riding with me that night, I had

21   assumed she came up because I was keeping an eye on the

22   subject and she was still at the back of the vehicle,

23   and that's why he came forward.

24       Q     So you had a trainee there as well?

25       A     Yes, ma'am.

**56**

1     Q    Okay.  Are you certified in administering the

2  standardized field sobriety test?

3     A    Yes, ma'am.

4     Q    Where did you obtain your certification?

5     A    Actually, I was trained on it at Aberdeen

6  Proving Ground.

7     Q    And when did you receive your certification?

8     A    That was back in October of 2007.  I actually

9  graduated from the academy in December of that year.

10     Q    And have you had to go back to get recertified

11  at any point?

12     A    No, ma'am.  We do annual training every year.

13  That's part of our 40 hours of annual training.

14     Q    So you receive 40 hours of additional training

15  every year?

16     A    40 hours of regular police training that we do

17  every year to keep up to speed on things.

18     Q    So how much of that 40 hours is devoted to the

19  field sobriety testing?

20     A    Last year I think we had maybe four hours that

21  went to that.

22     Q    In this certification training did they teach

23  you as to what constitutes passing and failing a

24  particular test?

25     A    Yes, ma'am.

**57**

1     Q    Let's start with the walk–and–turn since you

2  actually performed that one.  How many clues are

3  indicative of that particular test?

4     A    I believe that one, there are six or eight

5  clues that are indicative on that one.

6     Q    And can you tell the jury what those clues

7  are, please?

8     A    Basically, it's being able to maintain a

9  straight line walking, making sure heel to toe comes in

10  contact as they take each step, and also counting out

11  loud.

12     Q    And what constitutes failing the test, then?

13     A    The thing is you can add up the number of

14  clues from each step that they miss and stepping off the

15  line using their arms to maintain their balance.

16     Q    Is there a certain percentage of clues you

17  have to fail?

18     A    Basically, went through there –– usually on

19  the walk-and-turn –– I'm trying to remember exactly what

20  it was stated –– anything over six is a failure of the

21  test.

22     Q    Were you there or did you perform the

23  one-legged stand?

24     A    No, ma'am.  I was there when it was being

25  performed, but I did not perform it.

**58**

1      Q      And you were able to observe Mr. White taking

2  the one-legged stand test?

3      A      Yes, ma'am.

4      Q      Can you tell the jury how many clues are

5  indicative of that particular test?

6      A      I believe -- I want to say there was four of

7  them on that.

8      Q      I'm sorry?

9      A      I believe there was four of them on that, as

10  far as maintaining your balance, keeping your foot off

11  the ground.  The thing is on the clues, if they touch

12  the ground more than once, that's another clue.  It adds

13  up.

14      Q      So how many clues do they have to perform

15  poorly on before they fail?

16      A      On that, if they can't keep their foot up, if

17  they are not counting out loud, if you have four to six

18  times of touching -- four of those clues that come up as

19  far as touching the ground, not maintaining their

20  balance, holding their arms up, they basically fail the

21  test.

22      Q      On the one test that you performed, did you

23  explain to Mr. White how to perform that test?

24      A      Yes, ma'am.

25      Q      And can you tell the jury again what exactly

**59**

1   you told him?

2        A    Basically, just what I told him before,

3   basically standing in a position one foot in front of

4   the other, take nine steps forward.  On the ninth

5   step -- counting out loud each step.  On the ninth step,

6   do a pivot turn, come back and count nine more back.

7        Q    Is it always nine steps?

8        A    Yes, ma'am.

9        Q    And they are supposed to keep one leg on the

10   ground and turn; is that correct?

11       A    Right.  Well, the one foot, they can move it

12   and pivot it, but the other one is to step around.  That

13   way they are not hopping around.  I have actually seen

14   them jump and spin around, which we don't want them to

15   hurt themselves.

16            If they are off balance, stepping off the

17   line -- usually it's an imaginary line.  If we do have a

18   real line, we do that.  If it's an imaginary line, just

19   keep their feet heel to toe and walk those nine steps.

20       Q    Do you remember what type of footware

21   Mr. White had on that evening?

22       A    I really don't recall.  I want to say they

23   were loafers, but I couldn't swear to that.

24       Q    You said Officer Adams approached at what

25   point?

**60**

1      A     He approached about the time I finished the
2  walk-and-turn test and offered to do the field sobriety
3  test and take over.

4      Q     And at that point he took over?

5      A     Yes, ma'am.

6      Q     Did he begin all the tests over again?

7      A     Yes, ma'am, he started back.

8      Q     Was there a reason he started completely over
9  again?

10     A     Basically, just to keep with the flow of how
11 things go.

12     Q     Was he aware that you had already performed
13 certain tests before he arrived?

14     A     Yes, ma'am.

15     Q     At what point did you take Mr. White into
16 custody?

17     A     At the point that Officer Adams had completed
18 all the field sobriety tests, we determined that he was
19 under the influence of alcohol and we took him in.

20     Q     Where was his vehicle at the time you took him
21 into custody?

22     A     Basically, it was still in the turn-around
23 lane at Gate 9, by the rear edge of the gate.  And at
24 that time I asked him if he wanted to let his girlfriend
25 drive the vehicle home, and he told us that she could

1   not drive a stick shift.  We explained to him what we

2   were going to do is take him up, put him on the Drager,

3   and he would spend whatever time to get his blood

4   alcohol down, and he could pick his vehicle back up.  At

5   that point in time he wanted his keys and his wallet

6   given to his girlfriend.  And since she couldn't drive a

7   stick shift, we dispatched a cab to take them home.

8           Q    Where did the vehicle go after that?

9           A    Basically, I started the vehicle up, moved it

10  out of that spot and pulled it right in front of the

11  gate and rested it there, secured it at the scene, and

12  gave the keys to his girlfriend.

13          Q    So the vehicle was left there, then, basically

14  near the gate?

15          A    Yes, ma'am, right there at the gate.

16          Q    And then you went to the police station on the

17  Arsenal?

18          A    Yes, ma'am.

19          Q    What happened after you arrived at the

20  station?

21          A    Basically, we moved him inside, took the

22  handcuffs off of him, sat him in a chair, explained the

23  procedure to him, gave him the implied consent, told him

24  about the Drager, and he refused to blow.  I said, I

25  understand; I'm still waiting for the machine to put the

**62**

1    information in.  As soon as it got warmed up, I asked

2    him again if he would submit to the test, which he

3    refused to do so, and I put him down as a refusal,

4    printed out the forms, and at that time we locked him up

5    in the D-cell.

6        Q    You said you explained to him the implied

7    consent law?

8        A    Yes, ma'am.

9        Q    Did you believe he understood that law?

10       A    Yes, ma'am.  I asked him if he understood it,

11   and he stated he did.

12       Q    So you don't believe he was too intoxicated to

13   the point where he couldn't understand that?

14       A    No, ma'am.

15       Q    When did you lock Mr. White up?

16       A    I would say approximately 2045 hours.

17       Q    So approximately 8 --

18       A    Somewhere 8:30, 8:45.

19       Q    And, if you know, what time he was released

20   the next morning?

21       A    I really don't recall.  I wasn't there in the

22   morning that they released him.  That was taken care of

23   by day shift.

24       Q    What is the typical amount of time that you

25   detain somebody if they refuse to blow the Drager?

**63**

1      A    It's a 12-hour period.

2      Q    Is there any reason to believe that he was

3 kept any longer that the 12 hours?

4      A    Not that I'm aware of.

5      Q    Did you have any conversation at all with

6 Ms. Ivy or the children that were in the back seat?

7      A    No, ma'am, I did not.

8      Q    I believe you said you asked Mr. White if he

9 had had any alcohol that evening?

10     A    Yes, ma'am.

11     Q    And, again, what did he tell you?

12     A    Basically, I asked if he had had anything to

13 drink, and he stated he had had a couple of drinks

14 before he left the house.

15     Q    And by "drinks," I'm assuming you meant

16 alcoholic beverages?

17     A    Yes, ma'am.

18     Q    At any time while in your presence did

19 Mr. White ever lose his balance to the point that he

20 fell down?

21     A    No, ma'am.

22     Q    Was he ever belligerent or rude?

23     A    No, ma'am.  He was very compliant.

24          MS. POPE:  No further questions at this

25 point.

**64**

1          THE COURT:  All right.  Thank you.  Anything

2    further?

3          MR. SMITH:  Yes, Your Honor.

4                    **REDIRECT EXAMINATION**

5    **BY MR. SMITH:**

6          Q    When you approached the scene, Officer, were

7    you aware where the defendant was sitting?

8          A    Where was he sitting?

9          Q    Right.

10         A    He was in the driver's seat of the '98 GMC

11   Sonoma.

12         Q    Was there any reason to believe that he did

13   not drive his vehicle onto the Arsenal?

14         A    No, sir.

15         Q    No indication that somebody else drove?

16         A    No, sir.

17         Q    Who made the final decision to transport or

18   essentially arrest Mr. White?

19         A    Officer Adams and myself.  Since Officer Adams

20   completed all the field sobriety tests, that's where the

21   determination was made.

22         Q    To summarize, what observations led you to

23   make that decision?

24         A    Basically, it was the failure of the field

25   sobriety tests, also the slurred speech, his appearance,

**65**

1  and at point in time it was felt he was too intoxicated

2  to be driving the vehicle.

3      Q    If someone has footware that might compromise

4  their performance on the test, do you invite them to

5  take those off?

6      A    Yes.  They are given the opportunity to.  I've

7  had people with sandals or flip-flops that they take

8  off.

9      Q    Had Mr. White had some sort of compromising

10 footware, do you believe you would have noticed that?

11     A    Yes, sir.  And we also ask about any medical

12 conditions at the beginning of the field sobriety test,

13 anything that might impair them.

14     Q    Do you remember Mr. White saying anything to

15 you at all about his medical condition?

16     A    The only comment he made was something about

17 he couldn't fly helicopters because his eyes didn't

18 follow things.

19     Q    But as far as being able to walk or to do the

20 other tests, he made no mention of any medical issues?

21     A    No, sir.

22          MR. SMITH:  No further questions, Your Honor.

23          THE COURT:  Anything else?

24          MS. POPE:  Yes, Your Honor.

25

1                    **RECROSS EXAMINATION**

2    **BY MS. POPE:**

3        Q    Officer Dean, who made the determination that

4    Mr. White needed to be detained for possibly being under

5    the influence?

6        A    As far as us taking him to the station or just

7    the detention?

8        Q    Either one, or both.

9        A    Basically, myself and Officer Adams both came

10   to that conclusion and we transported him to the

11   station.

12       Q    Did you ever have a conversation with Officer

13   Adams about whether or not he needed to be detained for

14   being under the influence?

15       A    No, ma'am.  Basically, when we are doing --

16   when we're watching an officer performing these tests

17   and we see that he is failing it and both of us make an

18   agreement to go ahead and put the cuffs on.  So as soon

19   as he completed it, we spun him around and we put the

20   cuffs on and told him he was going to the station for

21   DUI.

22       Q    You said that he never said anything about a

23   medical condition; is that correct?

24       A    No, ma'am.

25       Q    Didn't he, in fact -- and it's included in the

**67**

1    report -- tell you that he had diabetes and he asked

2    you -- I guess teased you about Jimmy Dean and asked you

3    for a sausage biscuit to eat?

4         A    Yes, ma'am.  That was brought to our attention

5    after we had put him in the D-cell and Sgt. Gorman and

6    myself both went back there and he said he wanted a

7    sausage biscuit, he was hungry, and we didn't have

8    anything.  There was nothing open at that time to get

9    him unless we went to Oktoberfest and purchased him

10   something, but we just explained to him that we didn't

11   have anything to eat, and he said that he had diabetes.

12   So we tried to reach his girlfriend to confirm that or

13   not.  But, again, when we first initiated the field

14   sobriety test, he said he had no medical conditions,

15   other than his eyes not being able to follow.

16        Q    Were you ever able to verify with his

17   girlfriend about his diabetes?

18        A    No, ma'am.  She would not answer the phone at

19   home.  We left a message and never heard anything back

20   from her.

21             MS. POPE:  No further questions.

22             THE COURT:  Anything else?

23             MR. SMITH:  No, Your Honor.

24             THE COURT:  You may step down.

25             Ladies and gentlemen, at this time we are

**68**

1  going to take about a 15-minute break and help you wake

2  up.  Downstairs there are snacks and drinks.  If you

3  have any questions, ask my courtroom deputy.  See you

4  back in a few minutes.

5           (Jury is no longer present.)

6           THE COURT:  All right.  The jury is out of the

7  courtroom at this time.  Does the Government have any

8  further witnesses?

9           MR. SMITH:  No, Your Honor.

10           THE COURT:  Do you rest at this time?

11           MR. SMITH:  Yes, Your Honor.

12           THE COURT:  Do you have a motion for the

13  record?

14           MS. POPE:  Your Honor, the defense makes a

15  motion for a judgment of acquittal based on the fact

16  that the Government failed to prove that he was

17  intoxicated to the point that he could not safely

18  operate a motor vehicle.

19           THE COURT:  That's denied.  Are you ready to

20  go?

21           MS. POPE:  Yes, Your Honor.

22           THE COURT:  I will let you rest when the jury

23  comes back.  And you have two witnesses?

24           MS. POPE:  Yes, sir.

25           THE COURT:  All right.  Which one are we doing

**69**

1   first?

2           MS. POPE:  Her name is Teresa Ivy.

3           THE COURT:  She is the lady that was in the

4   courtroom a minute ago?

5           MS. POPE:  Yes, sir.

6           THE COURT:  All right.  Take about a 15-minute

7   break.  Go ahead and do that.

8           (Recess.)

9           (Back in open court.)

10          (Jury is not present.)

11          THE COURT:  All right.  Go ahead and bring the

12  jury in.

13          I will let you rest formally in front of the

14  jury.

15          I will note your objection for the record.

16  You don't have to make it again.  And then you can just

17  get started.

18          (Jury is present.)

19          THE COURT:  Welcome back.  I hope that helped

20  a little bit.

21          Are you prepared to go?

22          MS. POPE:  Yes, Your Honor.

23          THE COURT:  All right.  What says the

24  Government?

25          MR. EICHHOLZ:  The Government rests, Your

**70**

1  Honor.

2         THE COURT:  The previously noted objection is

3  again noted for the record and is overruled.  Is the

4  defendant ready?

5         MS. POPE:  We are, Your Honor.

6         THE COURT:  All right.  We have a witness on

7  the stand, and her name is?

8         MS. POPE:  It's Teresa Ivy.

9         THE COURT:  I'm going to ask my courtroom

10  deputy to place her under oath.

11         MS. POPE:  I would just like to tell the

12  jury:  Ms. Ivy had an accident and hit her head and is

13  having some blood drainage into her eyes, so please

14  excuse the fact that she has sunglasses on.  The light

15  gives her severe headaches right now until her injury

16  heals up.  And then last night she banged her head on

17  the refrigerator, fell back, and hurt her back.  So she

18  is a trooper for being here today.

19                         **TERESA IVY,**

20  called as a witness by the Defendant, after having been

21  sworn to speak the truth, testified as follows:

22                  **DIRECT EXAMINATION**

23  **BY MS. POPE:**

24      Q    Ms. Ivy, where do you currently reside?

25      A    216 Cypress Creek Drive, Madison, Alabama.

**71**

1    Q    And do you know the defendant, Mr. George

2  White?

3    A    I do.

4    Q    And can you tell the jury how you know

5  Mr. White?

6    A    He is my boyfriend currently.  We live

7  together.

8    Q    How long have you known Mr. White?

9    A    Since July of 2010.

10    Q    Did you have an occasion to be with Mr. White

11  on the evening of September 18, 2010?

12    A    Yes.

13    Q    Can you tell the jury why you were with

14  Mr. White on that particular evening?

15    A    We were going to take my granddaughter and her

16  friend to Oktoberfest on the Arsenal.

17    Q    So you had your granddaughter and her friend?

18    A    Uh-huh.

19    Q    And how old is your granddaughter?

20    A    She was five then.

21    Q    And I'm assuming her friend was about that

22  same age?

23    A    Yes.

24    Q    Do you remember approximately what time you

25  arrived at Mr. White's house that evening?

**72**

1        A       Probably around 7:30.

2        Q       Did you go inside Mr. White's house that

3    evening?

4        A       Yes.

5        Q       Approximately how long were you there before

6    you left for the Oktoberfest?

7        A       Probably 30 minutes.

8        Q       Did the girls go in with you?

9        A       Yes.

10       Q       During that time did Mr. White have a drink in

11   your presence, an alcoholic drink?

12       A       No.

13       Q       At that time were you able to observe his

14   demeanor?

15       A       Yes.

16       Q       Can you tell the Court how he was acting?

17       A       Just normal.  Just talking to me and the

18   playing with the kids.

19       Q       Was he staggering?

20       A       Oh, no.

21       Q       Did you notice any slurred speech?

22       A       No.

23       Q       Whose vehicle did you take to Redstone Arsenal

24   for the Oktoberfest?

25       A       His truck.

**73**

1     Q     And I believe from the officer's testimony

2  that is an extended truck?

3     A     Yes.

4     Q     Okay.  Where did you sit?

5     A     In the front seat.

6     Q     And where were the two children placed?

7     A     They were sitting in the back.  There is,

8  like, a seat on either side.

9     Q     Approximately how long did it take you to get

10  to the Arsenal from Mr. White's house?

11     A     About 10 minutes.

12     Q     So he lives fairly close to the Arsenal?

13     A     Yes, real close.

14     Q     And if you remember, do you remember what gate

15  it is that you went to?

16     A     9.

17     Q     Did you have any discussion with Mr. White

18  that evening about what gate you were going through?

19     A     We were just going through Gate 9 because

20  that's the closest.  That's where he always goes

21  through.

22     Q     So it's close to his residence?

23     A     Yes.

24     Q     Ms. Ivy, you had your granddaughter and her

25  friend that evening; correct?

**74**

1      A      Yes.

2      Q      I'm assuming that you love your granddaughter?

3      A      Very much.

4      Q      Would you have ridden with Mr. White if you

5  had felt he had been intoxicated to the point where he

6  could not safely operate this vehicle?

7      A      No.

8      Q      When you arrived at the gate, was Mr. White

9  pulled over?

10     A      Yes.

11     Q      And can you tell the jury why?

12     A      Because I did not have my ID.

13     Q      You need identification to get onto the

14  Arsenal; correct?

15     A      Correct.

16     Q      What happened next after you got pulled over?

17     A      Well, because I didn't have my ID, the girl

18  was talking to him and then all of a sudden she asked

19  him to pull on up and over further, and then the next

20  thing I knew, there were two or three officers there.

21     Q      Did you remain in the vehicle?

22     A      Yes, I did.

23     Q      Were you able to observe at all Mr. White

24  performing any of the field sobriety tests?

25     A      Yes.

1     Q     Did you observe him do the walk-and-turn?

2     A     Yes.

3     Q     Did it appear that he was staggering off the

4  line?

5     A     No.

6     Q     Did it appear like he was bouncing around?

7     A     No.

8     Q     Were you able to hear him count?

9     A     No, I didn't hear him count.

10     Q     Were you able to see him do the one-legged

11  stand?

12     A     Yes.

13     Q     Did you see him, like, having to put his foot

14  down to maintain his balance?

15     A     Well, no more than I would have, too.  He did

16  a lot better than I could do on it.

17     Q     During that time did you overhear any kind of

18  conversation between Officer Adams and Officer Dean?

19     A     I did.  I didn't know their names, but I knew

20  them by their heights.  But yes, I did.

21     Q     And can you tell the jury what you overheard

22  the officers discussing?

23     A     They made him do the test twice.  One made him

24  and then the other one.  The shorter one said that he

25  thought he was okay.  He was going to let him go, but he

**76**

1    said it's up to you, to the taller one.  I don't know

2    their names.  And the next thing I knew, they decided to

3    keep him.

4         Q    Did they ask you if you could drive the

5    vehicle home?

6         A    Yes.

7         Q    And what did you tell them?

8         A    I told them no.

9         Q    Why could you not drive the vehicle home?

10        A    I can't drive a stick shift.  And I didn't

11   have my license with me either.

12        Q    That's true.  Okay.  The truck that you were

13   in was a standard transmission?

14        A    Uh-huh.

15        Q    So how did you get back to your home?

16        A    Called a taxicab, I believe, and we went on

17   to -- my daughter and her friend is actually the mother

18   of the little girl that was with us.  They were

19   already -- they were going, so we got them to take us on

20   over there.  I don't really remember, it has been so

21   long, but somebody took me.  I didn't drive over there,

22   because we left his truck there.

23        Q    So you went on back to enjoy the festivities?

24        A    Uh-huh.

25        Q    Do you remember ever receiving any phone calls

1   from the officers on your cell phone?

2        A    No.

3        Q    Were you able to hear your cell phone ringing

4   above the noise of Oktoberfest?

5        A    Oh, no, I wouldn't have been able to do that

6   there.

7        Q    Do you remember about what time you returned

8   home that evening?

9        A    I don't know.  Probably maybe 30 minutes

10  before it closed, because we had a baby.  We had a

11  2-year-old with us and he went to sleep, so we had to

12  leave sooner than the girls wanted to.

13            MS. POPE:  Thank you.  No further questions at

14  this time, Your Honor.

15                    **CROSS-EXAMINATION**

16  **BY MR. SMITH:**

17       Q    Good afternoon, Ms. Ivy.  You mentioned that

18  you overheard the officers speak?

19       A    Uh-huh.

20       Q    About where were you standing in relation to

21  the police officers?

22       A    I was sitting in the car.

23       Q    And can you judge about how far away they were

24  from you?

25       A    No.  They were standing at the back of it.

1    Q    So it was an extended cab vehicle and you were

2  sitting in the passenger's seat, but you were able to

3  hear their conversations?

4    A    Yes.  The windows were down.  It was hot.

5    Q    You said that your granddaughter and your

6  granddaughter's friend were in the vehicle with you?

7    A    Uh-huh.

8    Q    What were their ages?

9    A    Five.

10    Q    Both of them were five years old?

11    A    Uh-huh.

12    Q    Were they wearing seat belts?

13    A    Yes, they were.

14    Q    So the reason that you were initially stopped

15  was because you had forgotten your ID; is that correct?

16    A    Yes.

17    Q    And so the officer had further questions

18  following that?

19    A    Uh-huh.

20    Q    After this incident, Mr. White's license was

21  revoked; is that correct?

22    A    Yes.

23    Q    Who has been providing him transportation

24  since then?

25        MS. POPE:  I object.  That's not relevant.

1        MR. SMITH:  It indicates bias, Your Honor, as

2   far as the reason for her testimony.

3        THE COURT:  I'm going to sustain.  That

4   doesn't really show that.

5        MR. SMITH:  Yes, Your Honor.

6   Q     Your testimony was that prior to leaving for

7   Oktoberfest, you were at Mr. White's home; is that

8   correct?

9   A     Yes.

10  Q     You said for about 30 minutes?

11  A     20, 30 minutes, yes.

12  Q     And you said about what time did you leave

13  from the house to go to Oktoberfest?

14  A     8:00, around then.

15  Q     Is it possible that Mr. White could have

16  consumed alcohol prior to getting to the house?  Is that

17  possible?

18  A     That would be possible.

19        MR. SMITH:  No further questions, Your Honor.

20        THE COURT:  All right.  Anything on redirect?

21        MS. POPE:  No, Your Honor.

22        THE COURT:  Ms. Ivy, you may step down.  Thank

23  you very much.

24        MS. POPE:  We would call the defendant, George

25  White.

80

1        THE COURT:  Do you expect to recall Ms. Ivy

2   for anything further?

3        MS. POPE:  No, Your Honor

4        THE COURT:  Do you expect to recall Ms. Ivy?

5        MR. SMITH:  No, Your Honor.

6        THE COURT:  Any objection to her remaining in

7   the courtroom?

8        MR. SMITH:  I have no objection.

9        THE COURT:  All right.  She may remain in the

10  courtroom.

11                    **GEORGE W. WHITE,**

12  called as a witness by the Defendant, after having been

13  sworn to speak the truth, testified as follows?

14                  **DIRECT EXAMINATION**

15  **BY MS. POPE:**

16     Q    Mr. White, where do you currently reside?

17     A    I reside at 216 Cypress Creek Drive in

18  Madison.

19     Q    And are you currently employed?

20     A    Yes, I am.

21     Q    And can you tell the jury where you're

22  employed?

23     A    I'm employed on Redstone Arsenal, building

24  111.  The government contractor, my company's name, is

25  GGI Federal.

1      Q    So you certainly know your way around the

2    Arsenal; is that correct?

3      A    That's correct.

4      Q    Let's go back to the evening of September 10,

5    2010.  Can you tell the jury what your plans were for

6    that evening?

7      A    That evening was to go to Oktoberfest and take

8    Teresa Ivy, which you just met, and the grandchildren

9    and go enjoy the festivities on the Arsenal.

10      Q    Prior to leaving your home that evening, did

11    you consume any alcohol?

12      A    Yes, I did.

13      Q    What did you drink?

14      A    I drank one single, solitary vodka and

15    cranberry juice.

16      Q    When you say one single drink, can you

17    describe for the jury how large or small that drink was?

18      A    It was kind of a small cocktail glass.  It

19    probably had this much vodka in it (indicating), and the

20    rest was cranberry juice.

21      Q    Do you remember what time you finished

22    consuming that drink?

23      A    Probably right prior to Teresa coming to the

24    house, because she was out and about and went to get the

25    children and she had errands to run.  So it was --

**82**

1  probably I had just finished consuming it prior to her

2  pulling into the driveway because I was waiting for her

3  to come home.

4      Q    About how long did it take you to consume that

5  drink?

6      A    Maybe a half hour or so.

7      Q    And you had nothing to drink prior to that

8  vodka and cranberry juice?

9      A    Nothing at all.

10     Q    And did you have anything after that vodka and

11 cranberry juice.

12     A    Nothing at all.

13     Q    You took your vehicle to the Arsenal; is that

14 correct?

15     A    Yes, that's correct.

16     Q    And what vehicle did you take?

17     A    I took a '98 GMC Sonoma.

18     Q    Describe that vehicle for the jury, please.

19     A    It's a maroon, extended cab, 1998, standard

20 shift, GMC, long-bed truck.

21     Q    Were you the driver of that vehicle?

22     A    Yes, I was.

23     Q    What gate did you enter the Arsenal or attempt

24 to enter the Arsenal at?

25     A    I went to Gate 9, which is basically Rideout

**83**

1    Road, what they call it, or the Research Park Boulevard

2    gate.

3        Q    And why did you decide to enter the Arsenal

4    through that gate?

5        A    I entered the Arsenal through that gate

6    because -- for two reasons.  One is it's the closest

7    gate to my home, which is about the closest subdivision

8    to that gate in Madison.  No. 2, the Government out

9    there, officials, send e-mails out to everybody that

10   works on the Arsenal encouraging them to take

11   alternative gates than Gate 10 which is where the

12   general public goes in when they have events like a

13   concert or Oktoberfest.  They recently, the last two or

14   three events, sent out an e-mail to every employee that

15   says anyone that works on the Arsenal, for the

16   Government or a contractor, they encourage you to take

17   alternative gates.

18       Q    Did you ever tell the officer at any time that

19   you thought you were at Gate 10?

20       A    Absolutely not.

21       Q    Did you know what gate you were using?

22       A    Absolutely I did.

23       Q    When you arrived at Gate 9, was there any line

24   of cars waiting to get in?

25       A    There was no line of cars whatsoever.

**84**

1       Q     Tell the jury what happened when you
2   approached the gate.
3       A     When I approached the gate I recognized -- I
4   didn't realize that Teresa did not have her license on
5   her.  Oftentimes she takes her license and she doesn't
6   take her purse, but I didn't expect her to have her
7   purse because I pay for everything.  So as we pulled up
8   to the gate, I recognized that by time we got to the
9   guard shack that -- I asked her to get her ID card out
10  and she said she did not have it.  So not having an ID
11  card, I showed my Government CAC card, as they call it,
12  and I tried to talk the guard into letting us go on
13  without an ID card, without her ID card.  So they took
14  my ID card, my driver's license -- they asked me for my
15  driver's license and told me to pull around the guard
16  shack, which they customarily do when someone doesn't
17  have proper decals.  They generally will take your
18  driver's license and have them go around the shack to go
19  out the Arsenal, and generally the guard will bring the
20  driver's license back to that individual and give them
21  the driver's license and let them go off the Arsenal.
22      Q     So when you went to Oktoberfest that evening,
23  you knew that you were going to have to go through some
24  type of security; correct?
25      A     Absolutely.

**85**

1     Q     Tell the jury how you were dressed that

2    evening.

3     A     I was dressed that evening just wearing casual

4    clothes, blue jeans.  I had a pair of sloppy old sandals

5    on that were real loose, with socks, and a T-shirt.

6     Q     You said you had a pair of sloppy sandals on.

7    Can you describe in a little bit more detail what those

8    shoes were like?

9     A     They're basically open sandals.  They don't

10   have any straps or anything.  They are just basic

11   sandals with just the leather that goes across the top

12   that you slide your feet in that way.

13    Q     And you said you had socks on with those

14   sandals?

15    A     Yes, I did.

16    Q     Once you pulled around to the side, did a

17   couple of Redstone Arsenal officers approach the

18   vehicle?

19    A     When I pulled around to the side, initially

20   there was a female officer who came and talked to me.

21   Actually, I thought they were going to give my driver's

22   license back, but they did not.  She asked me to get out

23   of the car.

24    Q     And did you exit the vehicle?

25    A     Yes, I did exit the vehicle.

1    Q    Were you staggering upon exiting the vehicle?

2    A    Absolutely not.

3    Q    And once you exited the vehicle, where did you

4    go?

5    A    Well, they told me to go to the back, told me

6    to go to the back of the vehicle, so I went back to the

7    end of the truck bed.  I did not go around to the

8    tailgate.  I just went to the back of the vehicle.

9    Q    And did they give you further instructions

10   after this?

11   A    No, other than the fact that they were going

12   to give me some sobriety tests.

13   Q    How many officers were present at that

14   particular point in time, if you remember?

15   A    Well, a black female officer got me out of the

16   car, then Officer Dean took over, and at that time she

17   was standing back at the car and he took me around back

18   and started to administer the test on me.

19   Q    So at that time Officer Dean, did he perform

20   what they described as the walk-and-turn?

21   A    Yes, he did.

22   Q    Can you describe for the jury, if you

23   remember, what you were told to do?

24   A    He basically told me to take nine steps, count

25   them out, heel to toe, which I did, and they didn't give

1    me any particular instructions about how to turn.  They

2    just told me to go nine steps, turn around, and come

3    back the same way.  So I basically did a military about-

4    face, which I heard them describe as a hopping maneuver.

5        Q    At any time did you stagger off -- let me back

6    up.  Was there an actual line there?

7        A    No, there was no actual line.

8        Q    So what they described was just an imaginary

9    line?

10       A    That's what they described.  I didn't know

11    what they meant by a line there other than it was an

12    imaginary line.

13       Q    Did you, in your opinion, walk in a straight

14    line?

15       A    In my opinion, I did.

16       Q    Did you feel like you were swaying at any

17    time?

18       A    That particular test, I did not at all.

19       Q    Did you lose count?

20       A    I did not lose count.

21       Q    After you did the walk-and-turn, did another

22    officer arrive upon the scene?

23       A    Yes.

24       Q    Can you tell me, if you remember, or tell the

25    jury at what point Officer Adams arrived on the scene?

**88**

1    A    It was after I was administered this test that
2  he just showed up and sort of took over.

3    Q    Did he perform the test over from the
4  beginning?

5    A    Yes, he did.

6    Q    And so you did the walk-and-turn test again
7  for him?

8    A    Yes, I did.

9    Q    Did he give you the same instructions as
10  Officer Dean had given you?

11    A    Basically.  I don't know all the details of
12  what they were saying, other than the fact he wanted me
13  to walk toe to heel, nine steps, which I did.

14    Q    And you did the same exact type of turn?

15    A    Yes, ma'am.

16    Q    Let me back up just a minute.  The first
17  officer, Officer Dean, did he do the one-legged stand
18  test with you?

19    A    No.

20    Q    Was that test only performed by the second
21  officer, Officer Adams?

22    A    Yes.

23    Q    And tell the jury, if you can remember, the
24  instructions that Officer Adams gave you regarding that
25  particular test.

1     A    He basically told me to stand on one foot and

2    to hold the other foot up and count until he tells me to

3    stop.

4     Q    How did he tell you to count?

5     A    1001, 1002, 1003.

6     Q    And were you able to perform that test

7    satisfactorily?

8     A    As I recall, distinctly recall, I counted to

9    13, and on 13 I touched my foot down.  And at 13 he told

10   me okay, that's it.  He didn't make me go any further.

11    Q    Why did you only make it to 13?

12    A    Well, because it's sort of hard for me to

13   stand on one foot to begin with and my shoes were

14   unsteady; and, two, I was feeling a little shaky because

15   I hadn't eaten anything.  I described to the officers

16   that I was a diabetic and they said, What is your count,

17   this, that, and this other, and I said, Well, I can't

18   tell you because I don't have my meter with me, but I

19   did describe to them that I was a diabetic and I was a

20   little shaky because of it.  So that's what I did.  But

21   he didn't make me go any further once I put my foot down

22   for the first time at the count of 13, because I recall

23   that, because I was wondering when he was going to make

24   me stop counting.

25    Q    You said you hadn't eaten all day.  Why had

**90**

1   you not eaten all day?

2        A      Because I was busy doing things.  You know, it

3   doesn't necessarily mean that I have to eat all day

4   because I take a couple of different diabetic pills.  It

5   has to do with what my sugar is and how I feel.  But the

6   meter is what I use to take my glucose level quite

7   frequently, because what happens is you can have a

8   normal blood sugar, even slightly elevated, and there's

9   no reason to eat when the sugar is up.

10       Q      Had you taken your glucose levels that day?

11       A      I don't recall if I took them in the morning

12  or not.  I don't recall if I did.  I may have --

13  I probably did one in morningtime but not any more

14  towards the afternoon.

15       Q      And you mentioned that you take two

16  medications.  What medications do you take?

17       A      I take something called Glucovance, which is a

18  combination of what they call glyburide and metformin,

19  which is a common oral, and then I also, as of about two

20  or four months ago, the doctor in conjunction with that

21  prescribed me something called Januvia, which can be

22  used in conjunction with the other oral or one-a-day

23  pill.

24       Q      Were you already taking Januvia on

25  September 18, 2010?

**91**

1      A      Yes, I had those prescriptions, both

2    prescriptions.

3      Q      Did you inform the officers of your diabetic

4    condition at the time the field sobriety test was

5    performed?

6      A      Yes.  I had a conversation with him about it,

7    as a matter of fact.  I absolutely did.

8      Q      Prior to you performing the field sobriety

9    test, did the officers -- let's start with Officer Dean

10   first, since he was the first one.

11            Did Officer Dean demonstrate each test to you

12   before you performed it?

13     A      You know, I don't recall him actually

14   physically demonstrating it.  He basically discussed

15   what he wanted me to do.  He mentioned what he wanted me

16   to do, but I didn't see him standing and doing that

17   test.  He just described it to me.

18     Q      Then Officer Adams performed the field

19   sobriety test the second time; correct?

20     A      Yes.

21     Q      And did he demonstrate how to perform this

22   test for you?

23     A      I don't recall any of them performing the

24   test, showing me what they wanted me to do.  They gave

25   me a verbal description of what they wanted me to do.

**92**

1      Q      And how many times did you perform the walk-
2  and-turn?

3      A      Two times.

4      Q      And the one-legged stand?

5      A      One time.

6      Q      After you completed the test, what, if
7  anything, did the officer say to you?

8      A      Well, they decided to cuff me and take me to
9  the station and told me that they were going to give me
10  a breathalyzer test.

11      Q      Let's get to the breathalyzer test.  Did they
12  transport you to the station?

13      A      They did transport me to the station.

14      Q      And when you arrived at the station, did
15  Officer Dean go over what is commonly known as the
16  implied consent law?

17      A      To be absolutely truthful with you, I don't
18  really recall that conversation that much.  I realized
19  when he told me it was -- I guess what I'm saying is I
20  wasn't aware of it until he discussed it with me.
21  I didn't know that it was implied consent by having a
22  driver's license because I was not aware of that.  But
23  when he told me that, I told him I was still going to
24  refuse it.

25      Q      So he did explain to you that if you refused

1   to take the breath analysis test that your driver's

2   license would be suspended for 90 days?

3        A    That's right.

4        Q    And you still declined to take the test?

5        A    I still declined to take the test.

6        Q    Why did you decline to take the test?

7        A    I declined to take the test for the simple

8   reason that I've been hearing for years and years and

9   years on TV and everybody you talk to and everything

10  else that you don't have to take the test and don't take

11  it.

12       Q    Did you refuse to take the test because you

13  thought you would fail?

14       A    No.  I just didn't see any reason to have to

15  take it.  I figured that if I didn't have to take it,

16  which I've heard over and over and over again, I just

17  didn't take it.

18       Q    Do you remember about what time you were put

19  in the cell?

20       A    Probably around about 8:30, quarter to 9.

21       Q    And what time were you released the next

22  morning, if you remember?

23       A    I was released exactly 12 hours later.  The

24  fact is I had one officer come about 6 in the morning --

25  actually it was probably 4 in the morning and he said,

1    You know, come around 6, we can let you out of here, and

2    then the lieutenant -- I don't know his name -- come

3    around in the morning and I said, You know, I understand

4    I can be released like at 6 or 7 in the morning.  He

5    said, No, it's customary that once we put you in here,

6    you've got to stay for 12 hours regardless.  We can't be

7    breaking the rules for anybody.  We have to be standard

8    about it.  So even if the other officer said that you

9    could probably get out at 6, he had just recently

10   started working again, he worked out there before and

11   had a hiatus at some point and was back working again,

12   he said that he told me wrong.

13        Q    Exactly 12 hours later, were you indeed

14   released?

15        A    I was indeed released.

16             MS. POPE:  No further questions at this time,

17   Your Honor.

18             THE COURT:  Cross-examination?

19                     **CROSS-EXAMINATION**

20   **BY MR. EICHHOLZ:**

21        Q    Mr. White, you were drinking at the time?

22        A    I had one single, solitary drink.  So if you

23   want to call that drinking, I was drinking.

24        Q    And your home is in Madison?

25        A    My home is in Madison.

**95**

1      Q    About 10 minutes away?

2      A    About 10 minutes away.

3      Q    And you were driving that night?

4      A    I was driving that night.

5      Q    And when you got there, you were stopped at

6  the gate guard?

7      A    I was not stopped by the -- customarily they

8  want to see your ID, so when you pull up, you just stop

9  and show them your identification, which I had a

10  Government-issued identification card.

11      Q    My question is:  The first ID you showed them,

12  was that your driver's license or was that your CAC

13  card?

14      A    My CAC card.

15      Q    But then they took your driver's license?

16      A    Took my driver's license.

17      Q    So you showed them two forms of

18  identification?

19      A    No.  They asked me for my driver's license,

20  which I gave it to them because when Ms. Ivy did not

21  have her identification card, they asked me for mine,

22  her driver's license, ID, they asked me for my driver's

23  license.  And when they took my driver's license, they

24  asked me to pull around to the other side.  And as I

25  mentioned earlier, I had been working out there for so

1    many years that every time someone in front of me or

2    beside me does not have a decal or everyone in their car

3    doesn't have an ID card of some sort, they customarily

4    take the driver's driver's license and stop all the cars

5    so they will go around and then they physically bring

6    the driver's license back to the individual, give it

7    back to them, and tell them to vamoose.

8        Q    So you presented your CAC card and he gave you

9    that back?

10       A    Yes.

11       Q    And then they took your driver's license?

12       A    Yes.

13       Q    Okay.  You've worked at Redstone Arsenal for a

14   number of years?

15       A    Yes.

16       Q    But you still asked how to get to the

17   Oktoberfest?

18       A    I no more asked how to get to Oktoberfest.  I

19   know exactly how to get there.

20       Q    So you never asked that?

21       A    I never asked that.

22       Q    You weren't in any way confused as to what

23   gate you were at?

24       A    Absolutely not.  Actually I was quite shocked

25   at what the officer said.

1     Q     It sounds like it because the officer said you

2     didn't demonstrate the test the way they told you they

3     did?

4     A     They verbally described it to me and that's

5     what I did.

6     Q     And you told them about your diabetes prior to

7     doing any of the standard field sobriety test; right?

8     A     I talked to them about it maybe in between --

9     I don't know exactly if it was right before or right

10    after that they asked me.  I told them I was a diabetic.

11    Q     But obviously they didn't testify to that

12    today, though?

13    A     They didn't say anything about it today.

14    Well, no.  Officer Dean said I discussed it with him

15    when I went back at the police station.

16          I had a discussion with him right out there

17    during the course of the discussion with him in the

18    sobriety test, because they asked me, well, what is your

19    sugar level?  Are you having any problems?  I said, I

20    don't know.  It's hard to tell because I don't have my

21    meter on me, but it causes me to be shaky sometimes.

22    Q     And you don't exactly recall how the implied

23    consent was read to you; right?

24    A     Well, no.  They brought me back -- as a matter

25    of fact, I told them before they even took me to the

**98**

1    station you can take me to the station, but I'm not

2    going to take the breathalyzer test even if you take me

3    in.  So that's what I did when I went in there, I

4    refused to take it.  And when he told me I had to

5    surrender my license, I said well, so be it.

6         Q    And you said that you were asked to step out

7    of the vehicle?  You were told to step out of the

8    vehicle eventually?

9         A    Yes.

10        Q    But you didn't stumble at that point either?

11        A    No, I didn't stumble.  That's another thing

12   that shocked me.  I stepped out just like any person

13   steps out of a vehicle.

14        Q    And you didn't brace yourself on the vehicle?

15        A    Well, I'm not saying brace.  I'm not saying I

16   didn't put my hand on the truck.  I don't recall that.

17   But when you are standing next to the car, you may just

18   do that, but I wasn't holding onto the car because I was

19   afraid I was going to fall over.

20        Q    You mentioned these field sobriety tests.  And

21   like you said, you had flip-flops on; right?

22        A    Yes.

23        Q    But you never asked to take those flip-flops

24   off, did you?

25        A    No.  And they never asked me or gave me the

**99**

1  option, either.

2      Q     You realized at that point that you were at

3  least being considered for DUI, didn't you?

4      A     I did.  And not only that, not only was I

5  being considered, I was sort of surprised why they were

6  making me do the test twice.

7      Q     But even though you were being considered for

8  it, you still didn't think, hey, Officer, I couldn't do

9  that in these shoes?

10      A     They didn't say anything about it.  I didn't

11  discuss it with him or make any comment to him about it.

12      Q     But you did mention something about

13  helicopters, right, because that could prohibit you from

14  doing a test, didn't you?

15      A     Well, they talked about doing the eye thing

16  and I told him, look, I don't have control of the muscle

17  in my eyes to move my eyes around the way that they

18  would have liked me to.  And to answer your question,

19  yes, when I was in the military and had that test, the

20  doctor said, Well, this is not going to cause you any

21  problem except you will never be able to fly a

22  helicopter or jet airplane because you can't look at the

23  overhead panels.

24      Q     So at that moment you thought that you

25  couldn't do a test with your eye, but you thought that

**100**

1    those shoes weren't going to in any way prohibit you

2    from doing any sort of balancing test?

3        A    I didn't think about it prohibiting me, but I

4    also would say that when they told me to go heel to toe

5    back and forth, I did it fine as far as I was concerned.

6    And I didn't miscount anything either, which also blows

7    me away.

8        Q    So it's safe to say that, like you said, you

9    maintained toe to heel relationship?

10       A    Yes.

11       Q    And unlike what the officer said, you were

12   able to walk a straight line?

13       A    Yes.

14       Q    And unlike what the officer said, you never

15   stepped off line?

16       A    Yes.

17       Q    And unlike what the officer said, you counted

18   out loud the entire time?

19       A    Yes.

20       Q    And unlike the officer said, you never put

21   your feet together?

22       A    I can't recall when he was giving me the

23   instructions whether I put my feet together or not, but

24   when I did performed the test, I performed the test on

25   line heel to toe.

*101*

1    Q    Moving on to the one-legged stand, unlike the
2  officer said, you stopped at 13 and did not continue?
3    A    Did not continue.  They told me to count
4  until -- for him to tell me to stop.  So I counted from
5  1001, 1002, 1003, and I got to 10 and I thought he was
6  going to tell me to stop but I kept counting and at 13 I
7  touched my foot down, and at 13 he told me to stop.  I
8  didn't ever go to 20.  When I touched my foot down the
9  first time, he told me to stop, the first time.
10    Q    I'm a little confused about the diabetes.  You
11  said that you didn't eat anything all day?
12    A    I didn't eat anything all day.
13    Q    And you didn't check your sugar?
14    A    I may have checked it in the morning, but I
15  didn't check it that afternoon.  I was planning on
16  eating something when I went to the Oktoberfest.
17    Q    So you're a diabetic who is on two medications
18  at a time?
19    A    Yes.
20    Q    You don't eat anything all day?
21    A    Don't eat anything all day if my sugar is
22  high.  If it's up in the morning a little bit, then I
23  don't feel like I need to eat anything.  Diabetes is
24  something you manage.  You manage it with your meter.
25  So you just don't eat any time just to be eating.

**102**

That's how I manage it.  I've had diabetes for about
seven or eight years now.

Q    Do you manage it with cranberry juice, which
is a highly glucose-latent drink?

A    It doesn't matter.  You know, every now and
then you can drink something that's sweet.  Just because
you are a diabetic doesn't mean you can't eat a piece of
cake every now and then, but you can't eat cake all day,
every day.

Q    What if that's the only thing you eat that
day?

A    That could be possible, no issue with it.

Q    But regardless, you hadn't had anything to eat
all day?

A    No.

Q    Except for that one vodka and cranberry juice?

A    That's right.

Q    And you weren't expecting any sort of spike
with regard to your blood sugar at that point?

A    No.

Q    But at the same time you also told the
officers I might be experiencing some sort of spike, so
I might be a little shaky.  You told the officers that;
right?

A    I told them I could be a little shaky; I don't

1   know what my sugar is right now.  And I eventually asked

2   them for something to eat.

3       Q    You asked them for something to eat actually

4   after you were locked up in the detention cell?

5       A    No.  I asked for something to eat on the way.

6   I was talking with Officer Dean -- I sort of kidded with

7   him because his name was Jimmy Dean and I said, You're

8   not any kin to the sausage guy?  As a matter of fact, I

9   could use a sausage and biscuit right now.  And they

10  said they would try to get me some when I went back

11  there, but they put me in the pen and that was the end

12  of it.  As a matter of fact, the next morning the

13  lieutenant told me also, You know, George, I understand

14  you are a diabetic; we will try to get you something to

15  eat.  I didn't see hide nor hair from anyone until

16  three, four hours later until they let me out, at the

17  crack of dawn when they came in, change of shift at 6 or

18  something like that.

19      Q    I'm curious about this implied consent.  You

20  said that you understood that you would lose your

21  license for 90 days if you don't blow; right?

22      A    That was the law, I understand.  That's what

23  the law is, and so I said okay.

24      Q    Did you read that law that morning or that

25  night?

**104**

1       A    No, I didn't read the law.

2       Q    So unlike what Officer Dean told us, you did

3   not read it?

4       A    I never saw anything that he gave me anything

5   to read.

6       Q    Did Officer Dean inform you of the law that

7   night?

8       A    He may have mentioned it to me, but the only

9   paperwork that I ever saw was the paperwork that he gave

10  me, the charge, the next day and told me to send it in

11  to the central processing unit so it would show up on

12  this docket.

13      Q    So Officer Dean did not read you that law

14  verbatim?

15      A    I don't recall him reading anything to me from

16  a piece of paper.

17      Q    Did Officer Dean point to a sign on the wall

18  that clearly states that if you do not blow into this

19  machine, you will lose your license for 90 days?

20      A    No.

21      Q    And you did not see a sign such as that?

22      A    No.  I was in the cell all day long and I

23  didn't see anything.

24      Q    No.  I mean prior to --

25      A    No.  He took me straight back there and that

**105**

1   was the end of it.  He took me right back to where he
2   was going to give me the test, right back there, made me
3   give him my belt, took my shoes off, and I don't know
4   what else I may have had, a watch or something, and took
5   it from me.  And he put me at the table right there
6   beside the cell and warmed up his machine like he said.
7   I said, Fine.  I'm not going to blow into it.  He said,
8   Fine, but I have got to ask you anyway.  And I said,
9   Fine, but I told you when you were taking me here I
10  wasn't going to take it, so I'm sticking to my word.  He
11  said, Okay.  Well, you've got to stay here in the cell.
12  I said, Fine.  And he put me in there, and that was the
13  last I saw of Officer Dean until just then, until today.
14       Q    And as you said earlier, you had exactly one
15  drink that night?
16       A    Exactly one drink.
17       Q    And you did not think that if I just blow in
18  this machine, I can leave immediately because I know I'm
19  not drunk?
20       A    I didn't even think about that.  I just went
21  from the advice of what everyone has always told me,
22  what I've seen on TV through many, many years, so I
23  followed that advice, didn't blow into the machine.  I
24  didn't feel like I had to, no reason to.
25       Q    You didn't feel as though if I just blow in

**106**

1  that machine and I blow under the legal limit, I get to

2  walk out of here?

3      A    I didn't think about it.  I just went along

4  with what I've heard on TV, what I read, what people

5  talk about; said, You know, George, you don't have to

6  blow into the machine.  It's not a requirement.  You

7  don't have to.  So I didn't do it.

8      Q    So in spite of what the officer just told you

9  as far as what the Alabama state law is, you took the

10  legal advice of all these other people who you have

11  randomly heard?

12      A    In spite of that, that's what I did.

13          MR. EICHHOLZ:  Thank you.

14          THE COURT:  Any redirect?

15          MS. POPE:  Just a couple.

16                    **REDIRECT EXAMINATION**

17  **BY MS. POPE:**

18      Q    Mr. White, let me ask you:  When you got to

19  the station that night, did you have any awareness there

20  was an implied consent law?

21      A    I had no awareness at all about that.

22      Q    Did Officer Dean, whether he read it to you

23  off of a piece of paper or told you about it, did he

24  inform you that there was an implied consent law that

25  night?

**107**

1     A    As I recall, he mentioned that to me, but I

2   didn't -- I told him I still wasn't going to take the

3   test, and he said, Well, that's okay.

4     Q    At any time was he disrespectful, rude, or

5   anything?

6     A    No.  Officer Dean and I had a nice

7   relationship.  We chit-chatted while he took me in.  The

8   officers were not unprofessional.  They were decent.  I

9   had no issues with the officers.

10         MS. POPE:  No further questions, Your Honor.

11         THE COURT:  All right.  Anything else related

12   to redirect?

13         MR. EICHHOLZ:  No, Your Honor.

14         THE COURT:  You may step down.  Thank you,

15   sir.

16         Any further witnesses?

17         MS. POPE:  No, Your Honor, we have no further

18   witness at this time.  The defense would rest.

19         THE COURT:  All right.  The defense has rested

20   at this time.  Does the Government have anything

21   further?

22         MR. SMITH:  At this time the Government would

23   recall Officer Dean in rebuttal.

24         THE COURT:  Go ahead.

25         You are still under oath.

**108**

1                **FURTHER DIRECT EXAMINATION**

2  **BY MR. SMITH:**

3      Q    Officer Dean, we have a few questions we would

4  like to clarify based on testimony that we just heard

5  from the defendant.  Your statement reflects that the

6  arrest was about 1955 or when you first approached; is

7  that correct?

8      A    We first arrived or dispatched at 1955, so

9  given the time for the field sobriety test, the arrest

10  was probably about 2010, 2015.

11      Q    And can you translate that into --

12      A    8:10 to 8:15 p.m.

13      Q    Thank you.  In reference to the defendant's

14  claim of having diabetes or his medical condition of

15  diabetes, when is the first time that you heard anything

16  about that from the defendant?

17      A    That was after we placed him in the D-cell and

18  he wanted a sausage biscuit and that's the first time he

19  brought up the diabetes.

20      Q    Do you remember him mentioning anything at all

21  about diabetes while doing the field sobriety test?

22      A    No, sir.  Negative.

23      Q    And you did ask him about medical conditions?

24      A    Yes, sir.

25      Q    Can you remember the question that you would

1    have asked him or the question that you asked regarding

2    medical condition?

3         A    Basically, prior to starting any of the field

4    sobriety tests, the first thing you do is ask if they

5    have any medical conditions that would impair them from

6    completing the test and also are they wearing contacts

7    or anything like that.

8         Q    Do you understand that to also include a

9    condition such as diabetes?

10        A    Yes, sir.

11        Q    Did he mention anything to you about being

12   shaky or having low sugar or anything?

13        A    No, sir.

14        Q    All right.  As far as the implied consent law

15   when you took him back, when he was transported to the

16   police station, explain one more time the procedure that

17   you do in informing Mr. White of implied consent.

18        A    Basically, once he sat down next to the Drager

19   machine, we have a copy of the implied consent on the

20   wall, which I read it verbatim and pause in between to

21   make sure he understands each one of the steps in

22   between.

23        Q    And did you do that that night?

24        A    Yes, sir.

25        Q    And was he sitting down?

**110**

1    A    Yes, sir.

2    Q    And was his eyes fixed on that?  Did he look

3  at that?

4    A    Actually, he was sitting at an angle to me

5  where I was staring straight at the writing on the wall

6  on the post and reading it to him and he was

7  acknowledging that he understood it.

8    Q    Had you brought it to his attention?  Had you

9  showed it to him on the wall?

10    A    Right.

11    Q    As well as explaining it to him?

12    A    Yes, sir.

13    Q    And anyone that enters the room, is it obvious

14  to see it on the wall?

15    A    Yes, sir.  It's posted about this high above

16  the Drager machine.

17    Q    Did he ask any questions about it?

18    A    No, sir.

19    Q    Officer Dean, when you do arrests like this,

20  do you do the implied consent procedure the same way

21  every time?

22    A    Yes, sir.

23    Q    And why do you do it the same way every time?

24    A    Basically, it's a requirement before you can

25  administer the Drager test and it's part of our training

*111*

1   with the Drager.

2        Q    So what happened on the night of

3   September 18th with Mr. White was not unusual?

4        A    No, sir.

5        Q    And you followed the procedure as you received

6   it in your training?

7        A    Yes, sir.

8             MR. SMITH:  No further questions, Your Honor.

9             THE COURT:  Cross?

10                    **FURTHER CROSS-EXAMINATION**

11   **BY MS. POPE:**

12        Q    Officer Dean, this event happened

13   approximately six months ago; correct?

14        A    Yes, ma'am.

15        Q    Were you able to refresh your memory about

16   this event through reading of your report or anything

17   like that?

18        A    Yes, ma'am.

19        Q    So you're just like every human being; you are

20   not going to remember something that happened six months

21   ago in every detail without being able to refresh from

22   your report; is that correct?

23        A    Well, most of the things you recall and some

24   of the stuff you have to bring yourself back up to speed

25   on as far as every minute detail on.

*112*

1      Q    It wouldn't be uncommon for somebody to forget
2  a certain event; correct?
3      A    Depending on the event.
4      Q    For instance, Officer Adams testified that he
5  was the only one that ever performed a field sobriety
6  test.  So if he forgot that you did some also, would
7  that be something that --
8           MR. SMITH:  Objection, Your Honor.  Officer
9  Dean isn't aware of Officer Adams' testimony.
10           MS. POPE:  I was just asking would that be
11  something that somebody would forget?
12           THE COURT:  I think that's a sustainable
13  objection.  I sustain it the way it's worded.
14      Q    So without refreshing your memory sometimes,
15  there's no way six months later or even three months
16  later you are going to remember every detail about an
17  event?
18      A    Like I said, depending on what the event is.
19  A normal speeding ticket or something like that may be
20  harder to recall.  Most of the DUIs that I've had,
21  remembering the events that occurred that night are
22  pretty much clear in my mind.
23      Q    So you're saying that it's not uncommon for
24  somebody to forget some detail about an event?
25      A    No, it's not uncommon.  It's human nature.

*113*

1    Q    You said it was not uncommon?

2    A    Yes, ma'am.

3    Q    Okay.  You said you went over the implied

4  consent with him?

5    A    Yes, ma'am.

6    Q    Do they sign anything like the defendants do

7  after they have been Mirandized?

8    A    No, ma'am.

9    Q    So you just make sure that they understood it?

10   A    Right.

11   Q    Did he indicate that he didn't understand it?

12   A    No, ma'am.  He told me that he understood but

13 that he was not going to submit to the test.

14   Q    And you felt like he was competent enough at

15 that time to make that sort of decision?

16   A    Yes, ma'am.

17        MS. POPE:  No further questions, Your Honor.

18        MR. SMITH:  Just one more.

19              **FURTHER REDIRECT EXAMINATION**

20 **BY MR. SMITH:**

21   Q    Is it safe to say, Officer Dean, that part of

22 the reason why you do things the same way every time is

23 to help you in situations like this remember things?

24   A    Yes.

25   Q    And the process that you followed, is that the

**114**

 1    procedure you were supposed to follow based on your

 2    training and experience?

 3         A    Yes, sir, it's part of the training.

 4              MR. SMITH:  That's all.

 5              MS. POPE:  No further questions.

 6              THE COURT:  Thank you.  You may step down.

 7              Anything further from either party?

 8              MR. EICHHOLZ:  Not from the Government.

 9              THE COURT:  From the defendant?

10              MS. POPE:  Nothing from the defense, Your

11    Honor.

12              (End of testimony.)

13              (Closing arguments on February 24, 2011:)

14              (Back in open court.  The jury is not

15    present.)

16              THE COURT:  All right.  Back on the record.

17    The defendant is present, as are counsel for both sides.

18    Are we ready to go?

19              MS. POPE:  Yes, Your Honor.

20              MR. SMITH:  Just to put on the record, Your

21    Honor, Captain Eichholz had the military equivalent of a

22    grand jury that we weren't able to reschedule, so I will

23    be taking the conclusion of the case.

24              THE COURT:  Okay with me.

25              (Jury is now present.)

**115**

1        THE COURT:  Good morning, ladies and

2    gentlemen.  I'm happy that all of you made it back.  We

3    would be in a quandry if you hadn't, so thank you for

4    making it back.  I hope you had a nice night's rest.

5        The remaining parts of this case should not

6    take very long.  We are going to start at this point

7    with closing arguments.  Again, like the opening

8    statements, it is not evidence.  It's simply the

9    attorneys' opinions as to what they think the evidence

10   showed.  Obviously, what the evidence did show is your

11   decision.  You are the judge of the facts and what comes

12   from the witness stand, not what they say.  But they get

13   to tell you what they think the evidence has shown and

14   it's their opinion.

15       Because the Government bears the burden of

16   proof, they go first and last, closing argument, and

17   Captain Smith will be presenting argument for the

18   government.

19       Captain Smith, if you are ready to go, you may

20   start.

21       MR. SMITH:  Yes, sir.

22       Good morning, ladies and gentlemen.  As I

23   mentioned yesterday, the observations of the officers

24   that you heard yesterday are the facts in this case.

25   After our closing arguments, Judge Davis will explain to

1    you the law of Alabama as it relates to the prohibition

2    against drunk driving.  Under that law it essentially

3    says that a driver cannot operate a vehicle while under

4    the influence of alcohol.

5           Under the statute that we have brought against

6    or the charges that we have brought against Mr. White,

7    there is no requirement for us to show any sort of blood

8    alcohol content or level such as you've heard before

9    like .08.  There is no requirement on our part to show

10   that actual level.  All that we need to show is that he

11   was driving a vehicle under the influence of alcohol to

12   such an extent he could not do in a safe manner.  So

13   there's elements there:  driving, driving under the

14   influence, and, three, to such an extent he cannot

15   operate a vehicle in a safe manner.

16          The observations of the officers that you

17   heard yesterday speak to all three of those elements,

18   and I will go through those and show how those elements

19   match up with the observations with the facts in the

20   case.

21          First, driving.  From the officer's testimony

22   based on circumstantial evidence, we were able to infer

23   that Mr. White drove onto post.  From the defendant's

24   own testimony and from the testimony of Ms. Ivy, we also

25   heard that he drove on post, that he drove onto Redstone

*117*

1    Arsenal.  So we have driving.

2         The second, under the influence.  We have

3    officers' testimony as far as Officer Adams and Officer

4    Dean.  Both said that they observed the defendant

5    walking outside the vehicle.  Officer Dean saw the

6    defendant exit the vehicle and walk out of the vehicle

7    and saw him stumble and maintain his balance by using

8    the side of his vehicle.

9         Additionally, when Officer Dean went to frisk

10   him during the standard test that he does as far as the

11   frisk goes for officer safety, he was within close

12   proximity of Mr. White and was able to get a strong odor

13   of alcohol.  In fact, he said it was a stout odor, and

14   when asked on a scale of 1 to 10 what it was, he said it

15   was an 8.  Officer Adams, when he came on the scene, he

16   also testified that he noticed a strong odor of alcohol

17   emanating from the defendant.

18        Additionally, as Officer Dean performed the

19   field sobriety test, the standard test that he said that

20   he was trained on and that he always uses whenever he is

21   confronted with a suspected drunk driver, Mr. White hit

22   on certain clues, clues that Officer Dean and Officer

23   Adams were trained to look for.  Those clues included

24   not being able to perform the walk-and-turn test

25   correctly and not being able to perform the one-legged

1  stand.  He missed numbers when he was counting.  He was

2  unable to do two things at once.  All these are

3  indicators that he was under the influence of alcohol.

4        Additionally, when Officer Dean and Officer

5  Adams transported Mr. White to the police station,

6  Mr. White was given an opportunity to blow on the Drager

7  test; essentially, a ticket out of the situation that he

8  was in.  Were he to test under the legal limit, he would

9  have been free to go.  He chose not to take that ticket.

10  He chose not to take that exit; essentially, the exit

11  door that was available for him.

12        You heard his reasons and why he decided not

13  to.  But he was told about the implied consent law, that

14  he was going to lose his license for at least 90 days

15  should he decide not to take that.  In the face of that,

16  he went ahead and refused to take the Drager test.

17        Other factors that you heard from the

18  testimony yesterday all add up to the influence of

19  alcohol.  Even the defendant's own testimony said that

20  he was drinking alcohol that night.  He admitted on the

21  stand that he was drinking alcohol.

22        So based on the officer's testimony, based on

23  what you heard from the defendant, it's reasonable to

24  conclude that there was an influence of alcohol there.

25        And further, that last element, that he was

1    doing so that he was under the influence of alcohol to

2    the extent that he was unable to operate a vehicle

3    safely, can also be proven, can also be shown through

4    the field sobriety test that he was given.

5            Again, he was stumbling, he was unable to

6    perform specific tasks, specific instructions that he

7    was given.  He was slurring his speech.  All these

8    indicate a lack of inability of motor skills to do an

9    important task such as driving, especially as it relates

10   to safety.

11           The field sobriety test also, again, speaks to

12   his ability to operate that vehicle in a safe manner.

13   Those tests, as testified by the officers yesterday, are

14   designed to test and pick up on clues that show that a

15   driver can perform a task that can be correlated to

16   driving.

17           Both officers testified that he performed

18   poorly on this test.  And after observing the

19   defendant's performance on those tests, the officers

20   made a determination, formed an opinion, that he was

21   under the influence of alcohol to such an extent that he

22   could not operate that vehicle safely.  And you heard

23   their testimony yesterday.  Both of them testified that

24   they formed that opinion and in working together they

25   decided that it was best to get him off the road, to

1    arrest him for driving under the influence, and take him

2    down to the station for further processing.

3            Mr. White discussed his diabetic condition

4    yesterday.  Based on the officer's testimony, you heard

5    that they both gave him ample opportunity to discuss any

6    medical conditions while they were doing the field

7    sobriety test.  He had that opportunity, but he failed

8    to take that opportunity in the field.

9            Granted, he did mention it at the station

10   later as part of a joke where he was discussing a

11   sausage biscuit with Officer Dean, but while in the

12   field, while he had an opportunity to discuss his

13   diabetic condition to perhaps give justification as to

14   his behavior, he failed to take that opportunity, and

15   only now do we hear about that diabetic condition.

16           Again, the observations of the officers are

17   the facts in the case.  You've probably heard the

18   expression if it looks like a duck, quacks like a duck,

19   walks like a duck, it's probably a duck.  Well, in this

20   instance, perhaps it may be a crude analogy, but if

21   something looks like a drunk driver, acts like a drunk

22   driver, smells like a drunk driver, talks like a drunk

23   driver, then it's probably a drunk driver.

24           The officers, using much more advanced

25   observations than that analogy, they are able to take

**121**

1   those field sobriety tests, take the clues that they get

2   from that and make a good solid determination as to a

3   driver's ability to operate a vehicle in a safe manner.

4   Officer Dean and Officer Adams did that on the night of

5   September 18th at Gate 9 at Redstone Arsenal and they

6   made a professional determination that Mr. White was

7   under the influence of alcohol and that he was under the

8   influence to the extent that he could not operate that

9   vehicle in a safe manner.

10          I ask you to take the facts that you heard

11   yesterday, apply them to the law that will be explained

12   to you by Judge Davis, and come back with a verdict of

13   guilty for Mr. White.

14          THE COURT:  Ms. Pope?

15          MS. POPE:  Ladies and gentlemen, I would like

16   to say, first of all, that we appreciate your patience

17   and your attentive listening during the trial of this

18   man.  We understand that this can be a tedious process,

19   but, once again, the system simply does not work without

20   you, the jury.

21          As the Judge has said, all the evidence has

22   been presented.  What Captain Smith tells you just now

23   and what I'm about to tell you is not evidence.  You

24   have heard all the evidence that you are going to hear.

25   So let's just take a brief look over what our view of

*122*

1  the evidence is.

2          Mr. White is not denying that he had a drink,

3  one drink, a cranberry and vodka like he told you,

4  yesterday from that stand.  He finished that drink

5  approximately half an hour, give or take a few minutes,

6  before Ms. Ivy arrived with her two children and then

7  they piled in his truck and left for the Arsenal.

8          Ms. Ivy testified on the stand that when she

9  arrived, which they only stayed there maybe 20 minutes

10  to a half an hour before they left, he wasn't slurring

11  his words or that time.  He wasn't staggering around.

12  She further testified that had he been exhibiting those

13  behaviors, she wouldn't have gotten in the car.  She was

14  entrusted with her grandchild and her grandchild's

15  friend.

16          They then head off to Redstone Arsenal to Gate

17  9, not Gate 10 like the officer said.  He knew where he

18  was going.  He works on the Arsenal every day, has for

19  some number of years.  He went to Gate 9 because he was

20  hoping to avoid the lines.  And when he got there, he

21  was right; there was no line.  He pulled right up to the

22  gate.  He was pulled over not because he was operating

23  the vehicle unsafely but because Ms. Ivy had forgot her

24  identification.

25          It's when they pulled around to the side of

*123*

1  the guard shack and the officer leaned in to get his

2  further ID that they smelled the odor of alcohol.  Then

3  the other officers arrived.  Officer Dean, I believe,

4  was first, and he said at that time he had an officer

5  trainee with him, an Officer Duggin.  He starts

6  administering the field sobriety test.  He gets through

7  the walk-and-turn, and then Officer Adams pulls up.  I

8  hope I'm not reversing their names.  It gets a little

9  confusing.

10         Officer Adams testified from that stand that

11  only he had administered the field sobriety test, but

12  that clearly was contradicted by Officer Dean who said

13  he had begun and got through the test when Officer Adams

14  came and he started over again just to keep the flow of

15  continuity.  That's all he said, why he started over

16  again.

17         And Ms. Ivy testified that with the windows

18  rolled down she heard the officers discussing whether or

19  not to place him under arrest.  One officer thought he

20  was okay; one officer said, No, I think we need to

21  arrest him, so they thought they would arrest him.  They

22  arrested him.  They took him to the station.

23         As far as the field sobriety test goes,

24  Mr. White admits that he touched down on 13.  He said he

25  couldn't hold his leg up any longer.  He was wearing

**124**

1    sandals that provided him no stability, so he touched

2    down and that's where the test stopped.  At that point

3    the officer believed he was under the influence and then

4    he placed him under arrest.

5            He was then transported to the station.  He

6    was informed about the implied consent.  He doesn't

7    remember how he knew but he likely would probably tell

8    you that that's how he found out, from the officer,

9    because he didn't know about it prior to going into that

10   station.  Now, he knew his license would be suspended

11   but he didn't take the Drager.  Why?  Because everybody

12   had told him not to.  He had seen it on television, talk

13   shows; don't blow; don't blow.

14           Was that sound reasoning?  No, probably not,

15   but we don't always make decisions based on sound

16   reasoning.  Sometimes we make decisions based on what

17   friends tell us or what we see.  It may not be

18   necessarily true, but we do it.

19           But the one thing you have to remember:  Him

20   not taking the breathalyzer test is not an element of

21   this offense.  The fact that he did not take it is not

22   an element.  They don't have to prove he did or did not

23   take it or why he did not take it.  Again, it's not an

24   element of this offense.

25           Ladies and gentlemen, Judge Davis has already

**125**

1  instructed you yesterday and I'm sure you heard so much
2  stuff that you might not remember but the defendant over
3  here is presumed innocent until proven guilty beyond a
4  reasonable doubt that he was under the influence to the
5  point he could not safely operate the vehicle.  Again,
6  nobody saw him drive that vehicle.  He is not denying he
7  drove over there.  He got in, drove his stick shift
8  truck over there, made it to the Arsenal safely.  They
9  didn't testify that there had been a wreck or any kind
10  of traffic violations.  He was stopped going through the
11  gate, which is normal procedure for going onto the
12  Arsenal.
13          From all the evidence that you have heard, we
14  feel that the Government has not met their burden in
15  this case, and we would ask you to return a verdict of
16  not guilty.  Thank you very much.
17          THE COURT:  Captain Smith?
18          MR. SMITH:  Ms. Pope is right.  We don't
19  always make decisions that are based on sound reasoning;
20  and especially when someone is under the influence of
21  alcohol, decisions of sound reasoning aren't made.
22  That's just another illustration that Mr. White's
23  judgment was impaired and that his ability to operate a
24  vehicle in a safe manner was impaired that day.
25          Additionally, as far as implied consent, using

*126*

1   sound reasoning, if a person had an opportunity to clear

2   their name to essentially allow themselves to get out of

3   the situation they were in, they usually take that.

4   Mr. White did not take that opportunity.  And Ms. Pope

5   is right.  The person taking the Drager test or not

6   taking the test is not an element, but it is one factor

7   that you can consider in the totality of circumstances

8   in trying to determine whether or not Mr. White was

9   violating the law of Alabama of drunk driving.

10          Again, we ask you to take all these things

11  into consideration and carefully apply the laws of

12  Alabama and return a verdict of guilty.

13              (End of closing arguments.)

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

    I hereby certify that the foregoing transcript in the above-styled cause is true and accurate.

**Leah S. Turner, RMR, CRR**
**Federal Official Court Reporter**